52 A.3d 1117

**The PHILADELPHIA HOUSING AUTHORITY, Appellee**

v.

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 33, LOCAL 934, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 2009.

Resubmitted Nov. 22, 2011.

Decided Aug. 21, 2012.

70

Angela Irene Heverling, Pennsylvania State Education Association, Lynne Lepore Wilson, PA State Education Association (PSEA), Harrisburg, for Amicus Curiae, Pennsylvania State Education Association.

Samuel L. Spear, Spear Wilderman, PC, Philadelphia, for American Federation of State, County and Municipal Employees, Dist. Council 33, Local 934.

Arlene J. Angelo, Kelly Theresa Kindig, Mary Theresa Metzler, Philadelphia, Ballard Spahr Andrews & Ingersoll, L.L.P., for Philadelphia Housing Authority.

Sean Ashley Fields, PA School Boards Association, Inc., for Appellee Amicus Curiae, Pennsylvania School Board Association.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.*

We granted review to determine whether a labor arbitration award, issued pursuant to the Public Employe Relations Act ("PERA"),[1] and reinstating an employee discharged for acts constituting sexual harassment, violated well-defined and dominant public policy. Concluding that it did, we affirm the order of the Commonwealth Court, and vacate the award.

* The matter was reassigned to this author.

1. Act of July 23, 1970, P.L. 563, as amended, 43 P.S. §§ 1101.101–1101.2301.

Appellant, American Federation of State, County and Municipal Employees, District Council 33, Local 934 ("appellant"), and appellee, the Philadelphia Housing Authority ("PHA"), are parties to a collective bargaining agreement ("CBA") governing the wages, hours and working conditions of PHA's employees. The CBA includes a provision that an employee can be terminated only for just cause. Thomas Mitchell, a warehouseman employed by PHA, was accused of sexually harassing a co-worker, Stephanie Broadnax, and was fired following an internal PHA investigation. Thereafter, appellant filed a grievance on Mitchell's behalf. When the grievance procedures of the CBA were exhausted without a resolution satisfactory to appellant and Mitchell, appellant filed a demand for arbitration. Arbitration hearings were conducted on August 27, 2003 and February 17, 2004. The issue before the arbitrator was "whether [PHA] had just cause to terminate [Mitchell's] employment, and, if not, what would be the appropriate remedy." Arbitration Award, dated July 12, 2004, at 27. The arbitrator made extensive factual findings. *Id.* at 3–27.

Broadnax testified about Mitchell's numerous sexually explicit comments and actions toward her, which began in 2001 and continued into 2002. *Id.* at 3–10. She described acts of inappropriate touching and sexual comments made by Mitchell, which caused her discomfort, particularly when she and Mitchell were alone. She described one particularly egregious incident where Mitchell grabbed Broadnax from behind while she was filing paperwork, "grinding" himself into her for approximately 15 seconds. *Id.* at 5, 9. Another incident involved Mitchell hiding under a desk to "take a nap" and then asking Broadnax if he could "eat her pussy" while she worked. Mitchell would hug Broadnax, throw his arms around her neck, and "play with himself" while speaking to her; he made her "upset and nervous." Broadnax testified that she also witnessed Mitchell pinch the breasts of the other female warehouse employee, Linda Bradford.

Broadnax further testified that she was nervous in Mitchell's presence and described him as a bully and a source of

persistent annoyance; she testified that his actions were disgusting and upsetting to her. Broadnax conceded that there were occasionally jokes of a sexual nature among the eight employees who worked in the warehouse, but she stated that very little of this behavior was engaged in by anyone other than Mitchell.[2]

When Broadnax learned that Mitchell was going to be reassigned to a desk next to hers, she advised her supervisor, Joseph Brunetti, about Mitchell's conduct, and that she did not want to work so close to Mitchell. Then, Broadnax and Mitchell engaged in a verbal altercation which was apparently prompted by Mitchell's anger that Broadnax had reported his behavior to Brunetti. Brunetti broke up the argument, and took Mitchell outside to discuss and criticize his behavior. Brunetti told Mitchell that he had to stop touching Broadnax and refrain from any more yelling.[3] Shortly thereafter, Broadnax learned that the altercation had been reported to PHA's human relations department, and she met with PHA's Equal Employment Opportunity Officer, Rosanna Grdinich, to whom she described Mitchell's various acts and remarks.

Grdinich interviewed Broadnax and Mitchell at the warehouse, finding Broadnax credible and Mitchell not credible. Grdinich testified that PHA had a zero tolerance policy on sexual harassment, and because of this policy, she recommended that PHA take immediate administrative action against Mitchell, although she did not recommend a specific discipline. Susan Stefencavage, PHA's human resources assistant general manager, explained that the decision to termi-

2. Jonas Shour, a warehouse supervisor, testified that Mitchell's actions were joking, inoffensive and "normal," because "everyone" at the warehouse "does it." Arbitration Award at 10–11. Similarly, Bradford, the other female warehouse employee, testified that there was a great deal of sexual banter and "horseplay" in the warehouse, including some sexual touching, but that these activities did not cross boundaries of impropriety. *Id.* at 11–13.

3. Ten days later, Mitchell and Broadnax had another loud argument. This time, Brunetti reported the incident to his own supervisor, James Forbes. Forbes himself gave Mitchell a verbal warning to stay away from Broadnax, but Mitchell was not given any written warnings, or a suspension, prior to his termination. *Id.* at 13–15, 17. Mitchell had previously received a "satisfactory evaluation." *Id.* at 15.

nate Mitchell was based on: 1) his pattern of sexual harassment; 2) his unwanted touching of Broadnax; 3) his touching himself; 4) "the policy which provides for termination" [4]; and 5) the fact that there. was no way to accommodate Mitchell without placing others in jeopardy or "at risk" for sexual harassment. *Id.* at 19. Mitchell denied the allegations made against him.

The arbitrator concluded that Mitchell was not credible, and that Broadnax's testimony regarding Mitchell's inappropriate conduct was credible. The arbitrator specifically found that Mitchell had been adequately informed about PHA's prohibition against sexual harassment, and that his behavior toward Broadnax was "lewd, lascivious and extraordinarily perverse." *Id.* at 33. Although he found that Mitchell's misconduct was "unacceptable," the arbitrator also found that after the "verbal warning" given to Mitchell by Brunetti, Mitchell engaged in no further inappropriate sexual harassment of Broadnax. The arbitrator then concluded that PHA did not have just cause to terminate Mitchell's employment. PHA was directed to reinstate Mitchell and make him whole. *Id.* at 36–37.

PHA filed a petition to vacate the arbitrator's award, which the trial court denied. On PHA's further appeal, the Commonwealth Court reversed, holding that PHA's legal obligation to protect its employees constituted a "core function" of the agency that PHA could not bargain away and, therefore, the arbitrator's award requiring Mitchell's reinstatement was not rationally derived from the CBA and could not be enforced. *Philadelphia Housing Authority v. American Fed. of State, County & Mun. Employees*, 900 A.2d 1043 (Pa.Cmwlth. 2006), *vacated*, 596 Pa. 207, 941 A.2d 1257 (2008). Appellant petitioned for allowance of appeal, and by order dated January 2, 2008, this Court granted the petition, vacated the Commonwealth Court's order, and remanded with instructions to reconsider PHA's petition to vacate in light of *Westmoreland*

4. At all relevant times, PHA had posted a notice regarding its policy on sexual harassment in the workplace, which advised that if PHA concludes that sexual harassment occurred, a "variety of disciplinary measures may be used" including termination of employment. Arbitration Award at 32–33.

*Intermed. Unit No. 7 v. Westmoreland Intermed. Unit No. 7 Classroom Assistants Educ. Support Personnel Ass'n,* 595 Pa. 648, 939 A.2d 855 (2007) *("Westmoreland").* Our remand order essentially directed the Commonwealth Court to consider PHA's petition under *Westmoreland*'s newly adopted "public policy exception" to the "essence test," rather than the disapproved "core functions exception" the court had applied in the earlier appeal.[5]

Upon further briefing and reargument, the Commonwealth Court again reversed the trial court and vacated the arbitration award which reinstated Mitchell. *Philadelphia Housing Authority v. American Fed. of State, County & Mun. Employees,* 956 A.2d 477, 487 (Pa.Cmwlth.2008) *(en banc ).* Applying the public policy exception to the essence test, the court determined that the arbitrator's award reinstating Mitchell violated two related public policies, a policy arising from Title VII of the Civil Rights Act of 1964, and federal Equal Employment Opportunity Commission ("EEOC") regulations, as well as the policy embodied in the Pennsylvania Human Relations Act ("PHRA"): a public policy against sexual harassment, and a separate public policy favoring voluntary employer actions to prevent sexual harassment, including the imposition of sanctions against harassers. *Id.* at 483. The court determined

5. In *Westmoreland Intermed. Unit No. 7 v. Westmoreland Intermed. Unit No. 7 Classroom Assistants Educ. Support Personnel Ass'n,* 595 Pa. 648, 939 A.2d 855 (2007), the six participating Justices rejected any further application of the core functions exception to the essence test. The "essence test" is the highly deferential standard of judicial review of PERA grievance arbitration awards, which allows a court to vacate an arbitration award only where the award is without foundation in, or fails to logically flow from, the underlying CBA. *State System of Higher Educ. (Cheyney University) v. State College Univ. Prof. Ass'n,* 560 Pa.135, 743 A.2d 405, 413 (1999). The "core functions" exception to the essence test was based on the premise that a public employer does not relinquish those powers essential to its ability to properly discharge its various functions simply by entering into a CBA. *City of Easton v. American Fed. of State, County & Mun. Employees,* 562 Pa. 438, 756 A.2d 1107, 1111–12 (2000), *overruled in part, Westmoreland, supra* at 865. Instead of the core functions exception, a majority of Justices in *Westmoreland* adopted the "public policy exception" to the essence test. The public policy exception is grounded in the general rule that a court will not enforce an unlawful contract or one that otherwise violates public policy. *Id.* at 863.

that Mitchell's reinstatement, without any sanction whatsoever, undermined the public policies against sexual harassment, and thus could not be upheld. "If forced to honor the arbitration award, PHA will not be complying with Title VII and the PHRA, each of which requires that an employer impose appropriate discipline for proven cases of sexual harassment in order to ensure a safe work environment free of sexual harassment." *Id.* at 487.[6]

Appellant filed a petition for allowance of appeal in this Court, and we granted review on the following rephrased issues:

(1) Whether the Arbitrator's award violates a clearly articulated public policy, as defined by the public policy exception to the essence test, established by this Court in *Westmoreland?*

(2) Whether the Commonwealth Court misapplied the public policy exception by holding that public policy requires severe discipline by an employer in response to sexual harassment, notwithstanding that (a) the employee was disciplined in the form of a verbal warning; (b) the employee abided by the warning and committed no further harassment warranting discipline following the warning; and (c) federal and state regulations, cases, and policies, and the employer's own policy, do not require that an offending employee be punished, and contemplate that a warning may be a sufficient response to sexual harassment?

6. Judge Smith–Ribner filed a dissenting opinion in which she criticized the new public policy exception to the essence test, as established "in a vacuum," and focused instead on her view that the arbitration award "was rational and could not be seen as one that failed to flow logically from the collective bargaining agreement." 956 A.2d at 488–89. Judge Pellegrini separately dissented, concluding that "there is no public policy that every harasser must be fired...." *Id.* at 490. Judge Pellegrini further opined that he would reject the essence test, and would simply apply the standard of review applicable to judgment *n.o.v.*, as prescribed in the Uniform Arbitration Act. *Id.* This standard, Judge Pellegrini stated, "would allow courts to set aside arbitration awards that come to a manifestly unreasonable outcome thereby protecting the public employer, the union, and most importantly, the public." *Id.* at 498.

*Philadelphia Housing Authority v. American Fed. of State, County & Mun. Employees,* 601 Pa. 313, 972 A.2d 482 (2009).

■ As stated, our review of this appeal from a PERA arbitration award is governed by the essence test. If the issue falls within the scope of the parties' CBA, we may vacate the arbitration award only if it "indisputably and genuinely is without foundation in, or fails to logically flow from," the CBA. *Cheyney University,* 743 A.2d at 413. Under *Westmoreland,* if the essence test is satisfied, we may consider further whether the award violates a well-defined and dominant public policy. *Westmoreland,* 939 A.2d at 866 (essence test is subject to narrow exception by which arbitrator's award will be vacated if it violates public policy of Commonwealth). The parties do not dispute that the subject of the arbitration award—the termination of a PHA employee for "just cause"—flowed logically from the parties' CBA. The crux of this matter lies in the proper application of the public policy exception to the essence test. This is a pure question of law; our standard of review is *de novo,* and our scope of review is plenary. *Dechert LLP v. Commonwealth,* 606 Pa. 334, 998 A.2d 575, 579 (2010).

Appellant argues that, in vacating the arbitration award reinstating Mitchell, the Commonwealth Court failed to properly apply a highly deferential standard of review. Appellant argues specifically that the award is not contrary to any well-defined, dominant public policy, and thus the very narrow public policy exception to the essence test does not apply here. Appellant states that the exception derives from the law of contracts prohibiting enforcement of agreements that violate the law or public policy, and application of the exception should be undertaken "cautiously and infrequently." Appellant's Brief at 21. Here, according to appellant, the arbitrator's award did not violate any well-defined, dominant public policy that would preclude the use of a warning to curtail further sexual harassment, instead of termination of the offending employee. Relying on federal cases holding that counseling, admonishment or relocation may be sufficient disciplinary responses to harassment, appellant argues there is no public policy that requires "severe discipline" in response

to sexual harassment that has been otherwise effectively resolved; the public employer is not required to fire the harasser. *Id.* at 29–31. No public policy requires termination in response to sexual harassment; instead, argues appellant, the law simply "imposes an obligation on the employer to take steps reasonably necessary to stop the harassment," and "if it stops, as a matter of law the employer has fulfilled its obligation." *Id.* at 44.[7]

Appellee PHA argues that the Commonwealth Court properly vacated the arbitration award. According to PHA, termination of Mitchell was warranted under the circumstances, and the award reinstating him—together with back pay and no other sanction—was contrary to a dominant and well-defined public policy against sexual harassment in the workplace. PHA argues the public policy is clearly derived from federal law—Title VII of the Civil Rights Act of 1964, and the regulations of the EEOC—as well as federal cases interpreting them. PHA also cites to the PHRA, and this Court's recent decision in *Weaver v. Harpster*, 601 Pa. 488, 975 A.2d 555, 567 (2009) (in enacting PHRA, "the legislature articulated a public policy to eliminate all forms of invidious discrimination, including sex discrimination in the workplace"). PHA further argues that these laws also create a public policy which favors voluntary employer prevention of sexual harassment in the workplace, as well as the application of sanctions for harassment. The arbitrator clearly found that Mitchell had engaged in sexual harassment and, according to PHA, its responsive decision to terminate Mitchell advanced these strong public policies. PHA asserts that the arbitration award which removed all sanctions against Mitchell undermined PHA's attempts to comply with its own rules designed to

7. The Pennsylvania State Education Association ("PSEA") filed an *amicus curiae* brief in support of appellant's position that the arbitration award reinstating Mitchell did not violate public policy. The PSEA is a nonprofit corporation representing active and retired employees working in public schools in the Commonwealth, and states that it "has developed a reputation for comprehensive and expert legal research in the fields of education and labor law." PSEA Brief at 1. PSEA argues, *inter alia*, that public policy does not require termination or even severe discipline of an employee who engages in sexual harassment. *Id.* at 4.

eliminate sexual harassment. Further, according to PHA, the verbal "counseling" given to Mitchell prior to any investigation by PHA of the harassment claims could not possibly have constituted an adequate sanction for Mitchell's conduct. PHA claims that the arbitrator effectively condoned Mitchell's "unacceptable" behavior by ordering his reinstatement with back pay. PHA emphasizes that, despite appellant's argument to the contrary, PHA does not take the position that "severe discipline" or termination is required in every instance of sexual harassment; however, PHA does argue that it should be allowed to fire a sexual harasser under the right circumstances, such as those shown in this case.[8]

■ We turn to the issues before us, and conclude that the arbitrator's award forcing PHA to take Mitchell back with full back pay—without any sanction at all—violates a well-defined and dominant public policy against sexual harassment in the workplace, a public policy which is grounded in both federal and state law against sex discrimination in employment, including Title VII, the regulations of the EEOC, and this Commonwealth's own PHRA. *See generally Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (hostile environment sexual harassment is illegal sex discrimination and actionable under federal law); 43 P.S. § 952(b) ("It is hereby declared to be the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their ... sex, ... and to safeguard their right to ... hold employment without such discrimination ..."); Pa. Const. Art. I, § 28 ("Equality of rights under the law shall not be denied or

---

**8.** The Pennsylvania School Board Association ("PSBA"), whose function is "to assist local public school entities and to represent and promote general interest in the field of public education," filed an *amicus curiae* brief in support of PHA. Brief of PSBA at 1. The PSBA asserts, *inter alia,* that "an arbitration award interpreting a labor contract in a manner that frustrates the purposes of Title VII is contrary to the public policy of maintaining a workplace free from sexual harassment." *Id.* at 3. The PSBA further argues that this Court should apply the public policy exception to the essence test "in a manner consistent with the [PERA], a statute that prohibits a collective bargaining agreement that would undermine the health, safety or welfare of citizens of the Commonwealth." *Id.*

abridged in the Commonwealth of Pennsylvania because of the sex of the individual.").[9]

In *Weaver v. Harpster, supra,* this Court held that there was no common law cause of action for sexual harassment against an employer who is not subject to the PHRA. Notably, neither the *Weaver* majority nor the dissent disputed the existence of a public policy against sexual harassment in the workplace. Thus, the majority noted that "in the first section of the PHRA, the legislature articulated a public policy in the broadest of terms, establishing that the Commonwealth's interest in fostering employment without regard to sex applies to 'all individuals,' without limitation." 975 A.2d at 565.[10] The dissenting opinion of Madame Justice Todd, which was joined by this author, would have taken more affirmative remedial action in that arena, but the dissent's expression clearly articulated the sources for the Commonwealth's undisputed public policy: "the Pennsylvania Constitution, supported by statutory law, makes it unmistakably clear that the public policy of our Commonwealth simply does not tolerate invidious gender discrimination—here in the form of sexual harassment—with respect to continued employment." *Id.* at 573 (Todd, J., dissenting). Relying on the Equal Rights Amendment to the Pennsylvania Constitution, and the General Assembly's enactment of the PHRA, the dissent recognized a clear declaration of public policy against sex discrimination, of which sexual harassment is one form. *Id.* at 574 (Todd, J.,

9. As we discuss *infra* at note 12 and accompanying text, to the extent the sexual harassment in this case involved assaultive conduct, further support for the dominant public policy could be found in the Pennsylvania Crimes Code.

10. The *Weaver* majority focused on the fact that the PHRA applies only to employers with four or more employees, and as a result did not provide a statutory remedy to the employee-victim in that case, who did not work for such an employer. 43 P.S. § 954(b). The *Weaver* majority determined that the Legislature had designed the PHRA to provide the exclusive procedure for redress of a claim for damages arising out of sexual harassment in the workplace. 975 A.2d at 567. Our holding here—where a public employer sought to redress a victim's harm by firing the harasser, and was then undermined in that effort by a labor arbitrator—is not in tension with the decision in *Weaver.*

dissenting) (discussing Pa. Const. Art. I § 28 and 43 P.S. § 955).

Moreover, as the Commonwealth Court noted here, PHA's formal sexual harassment policy strictly prohibits discrimination or harassment on the basis of sex, and a notice posted in PHA's workplace advises that sexual harassment on the job violates Title VII. Arbitration Award at 32–33. *See also Philadelphia Housing Authority v. American Fed. of State, County & Mun. Employees*, 956 A.2d at 478–79. The notice warns that a finding of sexual harassment could result in a range of disciplinary measures, including oral or written warnings, demotion, suspension, or even discharge. Arbitration Award at 32; 956 A.2d at 479. The arbitrator expressly found that this notice "provided adequate information to [Mitchell] concerning the prohibition against sexual harassment/misconduct." Arbitration Award at 32–33. Accordingly, the Commonwealth Court had ample support for its recognition that "there is an explicit, well-defined, and dominant public policy against sexual harassment in the workplace," in both federal and Pennsylvania law. 956 A.2d at 483–84.

Nevertheless, the arbitrator ordered PHA to reinstate Mitchell with back pay, reasoning that warehouse supervisor Brunetti's verbal counseling put an end to the sexual harassment and thus adequately addressed Mitchell's "lewd, lascivious and extraordinarily perverse" conduct. Although we do not hold that termination was required under the circumstances here, we likewise reject the arbitrator's and appellant's counter-assertion that a public employer can be precluded from taking such decisive action against an employee following its investigation. A public employer should be empowered to implement a zero tolerance policy when appalling, assaultive, repeated sexual harassment is at issue. The arbitration award to the contrary in this case affirmatively encourages—indeed it rewards—sexual harassment in the public workplace.

Along these lines, PHA argues that the arbitrator's award here violates public policy because it prevents PHA from taking "appropriate corrective action following its sexual

harassment investigation," and because the "pre-investigation warning" given to Mitchell "logically could not have been discipline for misconduct disclosed only after the warning was issued." Appellee's Brief at 24. PHA does not claim that a "mere reprimand" or "warning" for sexual harassment is always insufficient and thus constitutes a *per se* violation of public policy. But, PHA does argue that supervisor Brunetti's conversation with Mitchell cannot have been categorized as appropriate remedial action because it took place before PHA's investigation, and before the extent of Mitchell's sexual harassment had been discovered by appropriate managerial staff at PHA.[11] After completing its investigation, PHA deemed termination to be a proper sanction, and PHA argues that the arbitrator's decision to reinstate Mitchell undermined PHA's attempt to comply with its legal responsibilities to investigate and then provide a remedy.

We agree with PHA on this point. The arbitrator specifically found that Mitchell was aware of the prohibition against sexual harassment in the workplace, and that he nevertheless proceeded to commit multiple acts of "lewd, lascivious[,] extraordinarily perverse" and "unacceptable" sexual harassment against his female co-worker victim. Mitchell's conduct was found to be neither an isolated incident nor confined to words. His actions went well beyond mere talking or unwelcome "banter" and involved unwanted physical contact. Mitchell characterized his conduct as mere horseplay, and denied the specific allegations. The arbitrator rejected Mitchell's testimony, thus establishing that, in addition to committing the charged acts, Mitchell also attempted to mislead the tribunal about them, and failed to take responsibility for his conduct.

The issue before the arbitrator was whether there was just cause for this termination, and if not, what would be the appropriate remedy short of termination. The absurd award here makes a mockery of the dominant public policy against

11. PHA also makes the salient point that Mitchell's apparent cessation of overt sexual misconduct in the few months after the verbal warning—and during the investigation, while all eyes were upon him—should not have prevented the imposition of appropriate discipline for the misconduct that had already occurred.

sexual harassment in the workplace, by rendering public employers powerless to take appropriate actions to vindicate a strong public policy. Such an irrational award undermines clear and dominant public policy.

Given the repeated assaultive conduct PHA sought to address, this should not be a difficult case. A public employer cannot be denied the power to impose consequences for this sort of inappropriate, and facially criminal, conduct.[12] Indeed, with the general notion in mind that recognized rights must generally have some form of remedy, it is clear that there must be a power in public employers to take meaningful steps to vindicate dominant public policy. To allow an arbitration award which finds that an employee engaged in "extraordinarily perverse" physical sexual harassment of a co-worker, yet then simply dismisses the conduct as unworthy of an employer response beyond initial "counseling," and reinstatement with back pay, would eviscerate the ability of employers to enforce dominant public policy.

As stated, in *Westmoreland,* a majority of this Court adopted a public policy exception to the essence test, although Mr. Justice Saylor, whose vote was necessary to recognizing that approach, emphasized that his concurrence was based on "the understanding that the exception is exceptionally narrow, consistent with this Court's prior explanations." 939 A.2d at 868 (Saylor, J., concurring). In this case, a holding that the arbitrator's award did not violate a well-defined, explicit, and dominant public policy would construe the public policy exception so narrowly that it would be, as a practical matter, completely negated. Appellant attempts to separate Mitchell's egregious behavior from the arbitrator's directive that Mitchell be reinstated without sanction for that behavior.

---

**12.** Mitchell's conduct arguably would constitute a basis for criminal prosecution for harassment and indecent assault, at a minimum. *See* 18 Pa.C.S. §§ 2709(a) (person commits harassment when, with intent to harass, annoy or alarm another, he subjects another to physical contact, repeatedly commits acts which serve no legitimate purpose, or communicates to such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures) and 3126(a) (person is guilty of indecent assault if person has indecent contact with the complainant without complainant's consent).

Appellant agrees that sexual harassment is against the law, but nevertheless argues that the arbitrator's award undermining PHA's attempt to vindicate the law by firing the harasser must be upheld.

Federal cases cited by appellant to support its position are materially distinguishable from the instant matter, and not only because they do not involve sexual harassment.[13]   For example, in *Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000), where a labor arbitrator ordered the employer to reinstate a truck driver who had twice tested positive for marijuana, and the employer challenged the award as violating public policy, the Supreme Court rejected the employer's challenge.   The Court recognized that there was a "detailed regulatory regime in a specific field" at issue in the case, such that "courts should approach with particular caution pleas to divine further public policy in that area." *Id.* at 63, 121 S.Ct. 462.   And in that "specific field," the Department of Transportation had set up a regulatory scheme that actually included and promised rehabilitation and testing for repeat drug users, in line with the conditions imposed upon reinstatement by the arbitration award:

> Neither the Act nor the regulations forbid an employer to reinstate in a safety-sensitive position an employee who fails a random drug test once or twice.   The congressional and regulatory directives require only that the above-stated prerequisites to reinstatement be met.

**13.**   One material distinction is when the cases involve private rather than public employers.   *See, e.g., United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) and *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), discussed *infra*.   Appellant's microscopically narrow reading of the public policy exception may be more defensible in the private sector, where the employers were subject to labor agreements governed by the National Labor Relations Act, and federal cases have articulated an extremely narrow exception to the essence test.   In the case of public employers, such as PHA, we may apply a less restrictive reading of the exception, and thus accord less deference to an arbitration award such as the inexplicable award at issue here.

*Id.* at 65, 121 S.Ct. 462. Given that the arbitrator's decision complied with this expressly stated public policy regarding drug abuser recidivist truck drivers, and where the legislation had complex remedial aims of which opportunities for rehabilitation are a "critical component," the argument that the arbitration award violated public policy failed. *Id.* at 64–65, 121 S.Ct. 462. The Court emphasized that the award did not "condone" the employee's conduct; instead it "punishe[d]" him by suspending him for three months without pay, requiring him to pay arbitration costs for both sides, and imposing conditions for continued employment. *Id.* at 65–66, 121 S.Ct. 462. *See also Communication Workers v. Southeastern Elec. Coop.,* 882 F.2d 467, 468 (10th Cir.1989) (suspension without pay of employee who engaged in sexual harassment only once, and was penitent and apologetic about it, was sufficient discipline). The no discipline award in the instant case is easily distinguishable.

The decision in *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), another victimless drug case,[14] is also distinguishable. There, the High Court held that an arbitration award reinstating an employee who had been accused of smoking marijuana on company property did not violate public policy. The Court focused on the fact that the employer had failed to prove the charge, *id.* at 34, 108 S.Ct. 364, and held that a "refusal to enforce an award must rest on more than speculation or assumption." *Id.* at 44, 108 S.Ct. 364. It was "by no means clear from the record that [the reinstated employee] would pose a serious threat to the asserted public policy" against the operation of dangerous machinery by persons under the influence of drugs, and the arbitration award was upheld. *Id.* at 45, 108 S.Ct. 364. By contrast, there is no question that the record in this case established that Mitchell sexually harassed his co-worker, by both word and deed, in direct violation of

14. We recognize that both *Misco* and *Eastern Associated Coal,* which involved drug use by workers in safety-sensitive positions, implicated potential harm to others. But in the case of sexual harassment, the harm to a victim other than the grievant himself has already occurred.

applicable state law, federal law and the employer's own stated policies, and failed to take responsibility for his conduct.

The decision in *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), another case which did not involve assaultive sexual behavior against a co-worker, is also inapposite. In upholding the arbitrator's award against the employer's claim that it violated public policy, the Court focused on the primacy of seniority rules in the parties' pre-existing collective bargaining agreement over a subsequent contract between the employer and the EEOC, designed to remediate past race and gender discrimination in hiring, and in which the union had not participated. The Court held that the employer was not entitled to "alter the collective bargaining agreement without the Union's consent" and thus the arbitrator's award was proper and enforceable. *Id.* at 771, 103 S.Ct. 2177. Here, PHA did not attempt to supplant the parties' CBA without the union's consent; instead, PHA applied the agreement's terms by discharging for "just cause" an employee who violated established public policy.

The Third Circuit's decision in *Stroehmann Bakeries, Inc. v. Local 776*, 969 F.2d 1436 (3d Cir.1992), which involved claims of sexual harassment, is more instructive. In *Stroehmann*, the labor arbitrator reinstated—with back pay—a worker who had been fired when the company discovered that he had sexually harassed a customer's employee. The Third Circuit affirmed the district court's order vacating the arbitrator's award while confirming that courts may vacate labor arbitration awards only when they "explicitly conflict with well-defined, dominant public policy." *Id.* at 1441, 969 F.2d 1436. The circuit court held that there is indeed a "well-defined and dominant public policy concerning sexual harassment in the workplace which can be ascertained by reference to law and legal precedent." *Id.* (citing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1); *Meritor Sav. Bank, supra;* 29 C.F.R. § 1604.11(a) (unwelcome sexual advances and other physical conduct of sexual nature constitute sexual harassment when such conduct has purpose or effect of creating intimidat-

ing, hostile, or offensive work environment)). In holding that the arbitration award was unacceptable under the public policy exception, the court stated that "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." *Id.* at 1442. *See also Newsday Inc. v. Long Island Typographical Union,* 915 F.2d 840 (2d Cir.1990) (reinstatement of repeat sexual harasser violated explicit, well-defined and dominant public policy).[15]

Although a labor arbitrator's decision is entitled to deference by a reviewing court, it is not entitled to a level of devotion that makes a mockery of the dominant public policy against sexual harassment. The award in this case encourages individuals who are so inclined to feel free to misbehave in egregious ways, without fear of any meaningful consequence. The arbitrator's opinion includes a detailed description of Mitchell's behavior in the workplace and the arbitrator concedes it was "unacceptable." But, the arbitrator ultimately divorced Mitchell's conduct, and his failure to accept responsibility, from any consequence and held that PHA did not have just cause to fire Mitchell. In our view, the rational way to approach the question is to recognize the relationship between the award and the conduct; and to require some reasonable, calibrated, defensible relationship between the conduct violating dominant public policy and the arbitrator's response.

Even if the arbitrator's award reinstating Mitchell were not patently unreasonable on its face, the arbitrator's reasoning

15. Appellant dismisses *Stroehmann* and *Newsday* as unique, and relies instead on various federal cases which suggest that reinstatement might be an appropriate result in situations involving less severe misconduct, *if* the errant employee is actually punished in some way. *See, e.g., Weber Aircraft, Inc. v. General Warehousemen & Helpers Union Local 767,* 253 F.3d 821 (5th Cir.2001) (eleven-month unpaid suspension for unspecified sexual harassment where victim was not "truly threatened"); *Westvaco Corp. v. United Paperworkers Int'l Union,* 171 F.3d 971 (4th Cir.1999) (nine-month unpaid suspension for verbal sexual harassment). *See also Way Bakery v. Truck Drivers Local No. 164,* 363 F.3d 590 (6th Cir.2004) (six-month unpaid suspension and five years of probation for racially offensive remark followed by attempts to apologize). *But see Chrysler Motors Corp. v. Int'l Union, Allied Ind. Workers,* 959 F.2d 685 (7th Cir.1992) (upholding award of 30–day suspension and back pay for worker who grabbed co-worker's breasts).

betrays a lack of appreciation for the dominant public policy, reasoning which obviously infected his award: the reasoning and the award simply cannot be separated one from the other. The arbitrator's finding that the pre-investigation discussion between Brunetti and Mitchell resolved the matter before a higher level of management became involved is equally problematic. Appellant apparently views this chastisement as an appropriate response that was "reasonably calculated" to stop the harassment, Appellant's Brief at 26, and that nothing more severe was either required or permitted. But, apart from acknowledging that "the only action taken in terms of counseling or discipline" prior to termination was Brunetti's "verbal warning," the arbitrator did not measure its value as discipline. The arbitrator was charged with determining whether termination was proper and, if not, whether some other form of discipline was. Were we to approve the arbitrator's award finding no just cause for termination, and ordering reinstatement with back pay, we would essentially be holding that PHA has no recourse from the arbitrator's conclusion that Mitchell's cessation of overt acts of sexual harassment, which he denied in testimony found to be unbelievable, sufficed to end the matter.

Still, appellant argues that the law of deference to arbitrators prevents PHA from firing an employee who engaged in "extraordinarily perverse" and "unacceptable" sexual harassment of his co-worker, and then failed to take responsibility for the conduct, and insists that PHA must give him a job and all his back pay. We reject this argument and conclude instead that a public employer must be permitted to do more than engage in adjectival condemnation when faced with this sort of employee misconduct. We therefore hold that the arbitrator's award of reinstatement with back pay violates the public policy of this Commonwealth, and we thus affirm the Commonwealth Court's decision to vacate the award.[16]

Order Affirmed.

16. As noted earlier, the Commonwealth Court expressly vacated the arbitration award. 956 A.2d at 487 n. 20. The Commonwealth Court's

Justice ORIE MELVIN did not participate in the decision of this case.

Justices SAYLOR and EAKIN and TODD join the opinion.

Justice SAYLOR files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice McCAFFERY files a concurring opinion in which Justice BAER joins.

Justice SAYLOR, concurring.

I join the majority opinion on the limited issue on which this appeal was allowed. I write only to observe that the reasoning applied in the recent decisions in *Ellwood City v. PLRB*, 606 Pa. 356, 998 A.2d 589 (2010), and *City of Philadelphia v. International Association of Firefighters, Local 22*, 606 Pa. 447, 999 A.2d 555 (2010) ("*IAFF*"), indicates there are areas of managerial prerogative accorded to public employers which reside outside the permissible range of bargaining. *See Ellwood City*, 606 Pa. at 374, 998 A.2d at 599–600; *IAFF*, 606 Pa. at 471, 999 A.2d at 569–70. This suggests that such areas likewise may not be invaded by grievance arbitrators in applying the terms of collective bargaining agreements (since it would be unreasonable for arbitrators to interpret agreements to accord concessions which could not be made by a public employer in the first instance).

This sector of the law has been a difficult one for the courts, given the strong, competing policies in issue. Nevertheless, upon my review of *Ellwood City, International Association of Firefighters*, and the present decision, I find that the reasoning tends to circle back to constrain the permissible range of arbitrability relative to a public employer's ability to implement discipline supported by just cause, in a manner very similar to the previously disapproved core functions exception. This having been said, I recognize that the present appeal is not an appropriate vehicle for a more definitive treatment of

mandate also reversed the trial court's decision denying PHA's petition to vacate the arbitration award. *Id.* at 487–88.

such aspect of the managerial prerogative overlay, in light of the limited grant of allocatur.

Justice EAKIN, concurring.

I fully agree Mitchell's conduct was despicable, and sexual harassment in the workplace should not be tolerated, and that there is a clear public policy against workplace sexual harassment. That, however, is not the policy on which the case is decided. The majority posits a corollary to this policy, dictating that it is against public policy to reinstate with back pay a public employee who has egregiously sexually harassed a coworker. I join the majority with the understanding the new public policy is limited to a public employer and egregious misconduct.

Just as with any form of repugnant behavior, there are gradations of misconduct, and the consequences that flow from such behavior must likewise have gradations commensurate with the conduct. Crimes such as assault are acts that are *de facto* against public policy—you cannot harass a coworker, and you are equally prohibited from punching them. But there are degrees of assault—a slap is not the same as a gunshot, though both qualify as assaults—and there are gradations of punishment that mirror the seriousness of the assault. Likewise, there are degrees of harassment, and there should be degrees of consequences as well. Where the harassment is by an employee paid by the public, the consequences of misconduct are presumptively greater. Where the harassment is, as here, egregious, the consequences must be greater.

However, while any workplace sexual harassment is against public policy, we cannot sanction a preemptive requirement of dismissal in all cases, no matter the level of misconduct. The majority does not attempt to address where the line is drawn for lesser harassment, or whether the same standards apply to non-public employers. Perhaps this is not the case in which to delineate standards and guidelines for arbitrators in keeping with this policy, but the same must at some point be offered. In the interim, I join the result of the majority.

I also join Justice Saylor's observations that the analysis of the majority harkens back to the "core function" test, as contrasted with the "public policy exception to the 'essence test.'" This case illustrates the amorphous and often nebulous nature of the essence test and policy exception thereto, and judicial application of the test is necessarily uncertain; this is not sanguine when employers and arbitrators try to predict the permissible range of sanctions. Perhaps a future reassessment of the "core function" test would lead us to a framework of review that is less uncertain for all concerned.

Justice McCAFFERY, concurring.

The majority correctly states that this appeal fundamentally concerns the "proper application of the public policy exception to the essence test." Majority op. at 77, 52 A.3d at 1121. Although I believe that the arbitration award here did not sufficiently consider the Commonwealth's strong public policy to prevent sexual harassment and thus requires revisiting, because I also believe that the majority failed to properly consider and apply the public policy exception in this case in several important respects, I must respectfully write separately.

My differences with the majority opinion's approach are several, and, respectfully, I find the majority's consideration of the public policy exception here to be troublingly unmoored from certain bedrock principles and, at the same time, lacking in sufficient consideration of the **other** public policy exception in this case. That is, the majority opinion takes an immensely broad and, I respectfully believe, inaccurate approach to the Commonwealth's public policy regarding sexual harassment, while barely acknowledging the clear public policy that is rooted in limited judicial review of labor disputes arbitrated under the Public Employee Relations Act ("PERA"), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

It is axiomatic that public policy is a category of public concern that is "well defined and dominant[,] . . . ascertained by reference to the laws and legal precedents **and not from general considerations of supposed public interests.**"

*Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855, 863–64 (2007) (plurality) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); emphasis added). As we observed:

> In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted. Rather, it is for the legislature to formulate the public policies of the Commonwealth. The right of a court to declare what is or is not in accord with public policy exists only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it. Only in the clearest of cases may a court make public policy the basis of its decision. To determine the public policy of the Commonwealth, we examine the precedent within Pennsylvania, looking to our own Constitution, court decisions, and statutes promulgated by our legislature.

*Weaver v. Harpster*, 601 Pa. 488, 975 A.2d 555, 563 (2009).

The instant case implicates the public policy concern regarding sexual harassment, which is a form of sexual discrimination. *See id.* at 564–65 (citing Section 952 of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 952). Employment without fear of sexual discrimination is a public policy goal of this Commonwealth. *Id.* The PHRA "provides the administrative procedures by which the right against discrimination shall be vindicated." *Id.* at 565.

On the federal level, Title VII of the Civil Rights Act makes it unlawful, among other things, for an employer to condone a sexually hostile work environment. 42 U.S.C. § 2000e–2(a)(1); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In *Meritor Savings Bank*, the United States Supreme Court determined:

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbi-

trary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Id.* at 67, 106 S.Ct. 2399 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (1982)).

The High Court also observed, however: "Of course, ... not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.... For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. 2399 (citations and some quotation marks omitted). Moreover, once a plaintiff pursuing a Title VII action shows the existence of a hostile working environment, the plaintiff must also establish the element of *respondeat superior. Andrews v. City of Philadelphia,* 895 F.2d 1469, 1486 (3d Cir.1990). "[L]iability exists where the [employer] knew or should have known of the harassment and failed to take prompt remedial action." *Id.* (quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989)). "Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." *Id.* Conversely, "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Howard v. Winter,* 446 F.3d 559, 567 (4th Cir.2006).

In this case, there can be no question that the arbitrator's findings of fact established that Ms. Broadnax was subject to a hostile work environment because of the actions of her co-employee, Thomas Mitchell. To this extent, I agree with the majority that the Commonwealth's public policy against sexual harassment was implicated by this case, a conclusion also

reached by the arbitrator here as well.[1]  I would also posit that under the arbitrator's factual findings, PHA clearly appeared to take prompt and remedial action when supervisory employees were notified of Ms. Broadnax's discomfort and concerns.

However, the majority opinion asserts that intermixed with the Commonwealth's clear public policy of preventing sexual harassment is some co-existing public policy that requires a PERA arbitrator to defer to an employer's obligation to conduct a high-level investigation into allegations of sexual harassment and to recognize the employer's chosen form of discipline, including a belief that the employer should be "empowered to implement a zero tolerance policy," which an arbitrator may not thereafter "undermine."  Majority op. at 81–85, 52 A.3d at 1124, 1124–26, 1126–27, and 1128.  Indeed, the majority states that "the record ... established that Mitchell sexually harassed his co-worker, by both word and deed, in direct violation of applicable state law, federal law **and** the employer's own stated policies, and failed to take responsibility."  *Id.* at 85–86, 52 A.3d at 1126–27 (emphasis added).  Public policy may be established by state law or federal law.  However, it is **not** established by an employer's policies or an employee's failure to take responsibility.  *See Westmoreland, supra* at 863–64 (holding that public policy is

1. At the same time, I would dispute the majority opinion's assertion that other warehouse employees who engaged in or were the subject of sexual banter or touching, but found such actions acceptable or even pleasurable, were also the victims of sexual harassment as the term is defined by law.  *See* majority op. at 87, 52 A.3d at 1128.  If these employees did not experience a hostile working environment, or faced a similar form of sexual discrimination, they were not subject to "sexual harassment" as defined by relevant law. Public policy is not grounded in general considerations of supposed public interests, but is ascertained by laws and legal precedents.  As defined under legal precedents, sexual harassment is not behavior that a reviewing court may find distasteful, but it is a form of sexual discrimination allowing for legal redress.  Thus, I cannot join the majority opinion's freeform use of the term "sexual harassment." *See id.*  Here, we are concerned only with the arbitrator's factual findings that support the conclusion that Ms. Broadnax was subjected to a hostile working environment as defined by statute, regulation, or case law.

"well defined and dominant[,] . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.").

A violation of public policy is the only circumstance that allows a reviewing court, including this Court, to interfere with a PERA arbitration award that meets the essence test. *Id.* Further, the public policy exception is extremely narrow. *Id.; see also id.* at 868 (Saylor, J., concurring); *Eichelman v. Nationwide Insurance Co.,* 551 Pa. 558, 711 A.2d 1006, 1008 (1998); and *BLaST Intermediate Unit 17 v. CNA Insurance Cos.,* 544 Pa. 66, 674 A.2d 687, 689 (1996) (quoting *Hall v. Amica Mutual Insurance Co.,* 538 Pa. 337, 648 A.2d 755, 760 (1994)) ("Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.").

Accordingly, considerations of an employer's subjective policies, even a zero-tolerance policy, what a reviewing court feels an employer "should" be able to do, or the employee's failure to take responsibility for his or her actions, do not in any manner constitute public policy and are thus not relevant to our inquiry. A reviewing court's only inquiry is whether the arbitration award, having met the essence test, violates a clearly established public policy. I respectfully, but strenuously, disagree with and oppose any view that judicial review of PERA arbitration awards may be based on upholding the employer's investigatory and disciplinary policies, unless those policies themselves unmistakably constitute a clearly established dominant public policy. The majority opinion does not support its conclusion that these internal employer policies do constitute a public policy that the arbitrator was required to recognize. Indeed, as even PHA acknowledges, there is no public policy that requires a sexual harasser to be fired in accordance with an employer's internal policy. *Cf. Eastern Associated Coal Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 67, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (holding that when neither the governing statute nor regulation requires the discharge of a worker violating transportation safety laws for drug use, the High Court will not infer a public policy that goes beyond the statutory and regulatory scheme). Moreover, here, PHA **specifically**

**agreed** that disputed issues concerning employee discipline were to be determined by final and binding arbitration. Accordingly, a reviewing court's insistence that the employer's investigatory and disciplinary policies must be made sacrosanct as a form of public policy is wholly incompatible with PERA, our case law interpreting PERA, and our case law defining public policy.[2]

Secondly, and of critical importance in my view, absent from the majority opinion is any serious discussion of the **other** public policy issue at stake in this case, namely, the highly deferential and limited judicial review of labor disputes arbitrated under PERA. This public policy is **explicitly** rooted in provisions of PERA and this Court's case law interpreting that act. We have stated:

> PERA mandates that the final step in the resolution of grievances or disputes arising from the agreement must be **final and binding** arbitration. 43 Pa.S.A. § 1101.903. Likewise, our Court, on a continual basis, has made clear **the strong public policy** of encouraging peaceful settlement of industrial disputes by means of arbitration.

*Office of Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO,* 577 Pa. 257, 844 A.2d 1217, 1222 (2004) (footnote and case citations omitted; emphases added).[3]

Final and binding arbitration is "highly valued" in labor relations; more critically, it is absolutely required for labor

2. Moreover, the arbitration award here did **not** prohibit the employer from conducting an investigation. The employer did conduct the investigation, and certainly the fruits of that investigation are now matters of internal record regarding Mitchell and possibly other employees. Moreover, the employer's actions would necessarily have become factors in its defense in a Title VII action, should one have arisen; however, these matters have no applicability to **the issue before us** of whether the arbitrator's award violated public policy.

3. Additionally, the introductory provision to PERA itself declares that it is the public policy of this Commonwealth to promote orderly and constructive relationships between public employers and their employees, that unresolved disputes between public employer and its employees are injurious to the public, and that adequate means must be established for minimizing these unresolved disputes and providing for their resolution. 43 Pa.S.A. § 1101.101.

disputes arising under PERA. *Westmoreland, supra* at 862. Consequently, "broad judicial review" of final and binding arbitration awards under PERA has long been recognized as incompatible with that Act's purposes, and a standard of review "characterized by great deference" is mandated. *Id.* Indeed, under PERA, reviewing courts are not permitted to impose their "own brand of labor relations philosophy" and act as "superarbitrator[s]." *State System of Higher Education (Cheyney University) v. State College and University Professional Association (PSEA–NEA)*, 560 Pa.135, 743 A.2d 405, 413 (1999). We have described the "heart" of PERA as the right of public employees to organize for purposes of collective bargaining, and the "lifeblood" of PERA as "the requirement that labor disputes arising under a collective bargaining agreement be resolved by final and binding arbitration." *Westmoreland, supra* at 861 (citing 43 P.S. §§ 1101.401 and 1101.903). "[F]requent judicial disapproval of the awards of [PERA] labor arbitrators would tend to **undermine a system of private ordering that is of the highest importance to the well-being of employer and worker alike.**" *Office of Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO*, 577 Pa. 257, 844 A.2d 1217, 1223 (2004) (quoting *Newark Morning Ledger Co. v. Newark Typographical Union*, 797 F.2d 162, 165 (3d Cir. 1986); emphasis added). Accordingly, a reviewing court is required to accommodate such plain and explicit public policy; I must respectfully conclude that the majority has failed to do so here.

The majority opinion's determination not to address this co-existing public policy is undoubtedly the cause, I believe, for its extremely troubling open-ended review of the PERA arbitration award. As this case concerns the public policy exception to the essence test, a critical component to judicial review, untouched by the majority opinion, is defining how a reviewing court is to proceed once it is recognized that the public policy exception to the essence test is implicated. In other words, what standard and scope of review applies that will not only allow the reviewing court to explore the record to determine

if, in fact, a public policy of this Commonwealth has been violated by the arbitrator's award, but will also respect the co-existing public policy against judicial interference—or at best, in very limited circumstances, minimal interference—in PERA arbitration awards, and respect the undeniable circumstance that **the arbitrator is the finder of fact,** not the reviewing court.

As this Court has adopted the federal essence test and the corresponding **federal** public policy exception, *see Westmoreland, supra* at 865,[4] it is instructive to observe how the United States Supreme Court balanced co-existing but perhaps competing public policies in its review of arbitration awards. In a series of cases, that Court emphasized that "the relevant statutory and regulatory provisions [of the public policy the award purportedly violates] **must be read in light of background labor law policy** that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation." *Eastern Associated Coal Corp., supra* at 65, 121 S.Ct. 462 (emphasis added). Accordingly, the High Court stressed that, whenever possible, reviewing courts should analyze an arbitration award in a manner that harmonizes the public policy that the award purportedly violates, with the public policy that is rooted in respect for, and non-judicial interference in, arbitration awards. In other words, the case should be viewed in a manner where both the salutary public policy goals implicated by the award and the salutary public policy goals involving labor interests can co-exist, rather than be pitched as antagonistic to one another. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers,* 461 U.S. 757, 771–72, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

Further, because of the overarching public policy encouraging quick, final, and binding resolution of labor disputes, in accordance with contracts negotiated by the employers and

4. "[W]e conclude that the federal public policy exception is appropriately applied to arbitrator's awards arising under PERA...." *Westmoreland, supra* at 865.

the employees' unions, the High Court determined that the focus regarding other public policy matters rests solely on whether the **award** violates public policy, not simply on whether the arbitration dealt with another public policy question. *Eastern Associated, supra* at 67, 121 S.Ct. 462; *see also United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 42–43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); and *Grace, supra* at 766, 103 S.Ct. 2177. Notably, the High Court did **not** "sanction a broad judicial power to set aside arbitration awards as against public policy." *Misco, supra* at 43, 108 S.Ct. 364.

I believe that the approach taken by the United States Supreme Court in the above trio of cases very closely reflects the philosophical foundation of our adoption in *Westmoreland, supra,* of a narrow federal public policy exception to the essence test, particularly since we heavily relied therein on *Misco* and *Grace. See Westmoreland, supra* at 863–64. Of particular significance is the Supreme Court's inclusive approach toward striking the appropriate balance between sustaining the overarching public policy concerns articulated in labor-management legislation, and those rare instances where an arbitration award issued pursuant to such legislation purportedly violates other public policy concerns. The overarching public policy to maintain a healthy labor-management legislative protocol yields to another public policy only where there is a genuine, not a perceived or desired, conflict between the policies, and where the second policy is indeed "dominant" and tangibly identified by relevant authority and not a product of what a reviewing court believes to be a general public interest.

Applying the above principles to the instant case, I would hold here that the fit between the arbitrator's factual findings, based on the evidence of record, and the arbitrator's actual award reflects such an alarming degree of disharmony as to justify the extremely rare recourse of judicial intrusion. Here, the arbitrator found that the employee's conduct was "lewd, lascivious, and extraordinarily perverse," based on factual findings that the employee had rubbed or "ground" his

clothed genital area into a co-employee, inappropriately hugged this co-employee, and articulated his desire to engage in sexual acts with this co-employee. Arbitration Award, dated 7/12/04, at 33–34. However, the arbitrator also found that the employee had ceased such activity after being warned by a supervisor to do so. Based on the latter finding, the arbitrator reinstated the employee with back pay.

I agree with the majority opinion to the extent that the arbitration award, summarized above, exhibited such scant consideration for the important public policy goal of preventing sexual harassment in the workplace that it must be revisited.[5] By reinstating Mitchell with back pay, thus imposing no penalty whatsoever on the employee, the arbitrator here failed to consider the victim of the sexual harassment as well as other potentially negative consequences of the award vis-à-vis the public policy that endeavors to discourage and prevent sexual harassment in the workplace. The award could easily be construed by others as giving free cover for harassing behavior until such time as the harasser is provided a warning.

I believe that under our precedents, as well as those of the United States Supreme Court, the above minimal analysis represents **all** that is needed for a reviewing court to conduct its review of an arbitration award that purportedly violates a public policy. If a reviewing court concludes under established precedents that the arbitration award violates, as it does here, a recognized public policy of this Commonwealth, then no further discussion of the record is warranted. The remedy would be to remand to the arbitrator to reconsider the award in light of the articulated violation. Anything more intrudes upon the **other** public policy against judicial interference in arbitration awards made pursuant to PERA.

5. However, unlike the majority opinion, I would not disregard the factual finding that a cessation of harassing behavior followed a warning by a supervisor. Such a factual finding is an important and obvious consideration by an arbitrator. Additionally, a reviewing court does not act as a "superarbitrator."

The majority opinion, however, failing to articulate any scope or standard of review for when a PERA arbitration award purportedly violates public policy, appears to simply dive right into a *de novo* review of the record before the arbitrator, which review appears to include, I respectfully but regrettably posit, reweighing evidence and even finding facts, as the following examples demonstrate: "PHA also makes the salient point that Mitchell's apparent cessation of overt sexual misconduct in the few months after the verbal warning—and during the investigation, while all eyes were upon him—should not have prevented the imposition of appropriate discipline for the misconduct that had already occurred." Majority op. at 82 n. 11, 52 A.3d at 1124 n. 11. The arbitrator did not make any factual finding that Mitchell had stopped his harassment when "all eyes were upon him" during the investigation. Rather, the arbitrator found salient that Mitchell had stopped his harassment after being warned, period. "Mitchell also attempted to mislead the tribunal about [the charged acts], and failed to take responsibility for his conduct." *Id.* at 82, 52 A.3d at 1125. The arbitrator did not make such factual findings, even though the arbitrator did not find Mitchell's testimony credible. And, as the majority opinion references Mitchell's "failure to take responsibility" several more times, one must question whether the majority, *sub silentio* and without legal foundation, is asserting such a concept as a new legal requirement to obtain relief in PERA arbitration. "Broadnax did present evidence of retaliation [by Mitchell] in the form of unexplained falling rag bundles, overturned paint cans and other items strewn about the warehouse, but the arbitrator dismissed the events as coincidences, finding they were 'not attributable to proven actions' by Mitchell." *Id.* at 88–89 n. 16, 52 A.3d at 1128 n. 16. The unmistakable implication here is that the arbitrator **should** have found that Mitchell did, in fact, perform these acts. Finally, *see id.* at 86–87, 52 A.3d at 1127–28 (wherein the majority opinion discounts the arbitrator's findings regarding the work environment, based on extensive testimony that there was a great deal of sexually charged joking and banter occurring. The majority opinion essentially concludes that this environment—and the arbitra-

tor's findings on this point—are irrelevant and refers to the **evidence** relied upon by the arbitrator as "reports." Further, the majority disparages the arbitrator's reliance on the apparently effective warnings of Mitchell's supervisor, criticizing the arbitrator's conclusion that the supervisor was part of the employer's management.).

The above-cited examples from the majority opinion are, in my respectful opinion, completely incompatible with PERA and this Court's precedents. *See, e.g., State System of Higher Education, supra* at 413. Indeed, I believe that some of the above-cited excerpts are incompatible with general principles of appellate review in any normal case. However, the present matter is not a normal appellate case, as it is a review of a PERA arbitration award and thus, subject only to rare, limited, and deferential review. Thus, I cannot join the majority opinion's wholesale *de novo* review, which is both without foundation and **wholly unnecessary.** The majority opinion's approach here can only foster confusion for any arbitrator or reviewing court that is required to consider the public policy exception to the essence test in the future.[6]

Additionally, without explicitly stating or providing any reasoning, the majority opinion has apparently determined that when a party contends that an arbitration award violates public policy, a reviewing court may, perhaps, examine the arbitration award to determine if the award is "reasonable." *See* majority op. at 83, 52 A.3d at 1125 ("Such an irrational award undermines clear and dominant public policy."); and at 87, 52 A.3d at 1127–28 (describing the arbitrator's award as "patently unreasonable" and then proceeding to assail the arbitrator's reasoning for reinstating Mitchell with back pay).

To the extent that this is the majority's position, I respectfully believe that a solid legal foundation must be made for what would appear to be a new standard in labor relations law.[7] For my part, I believe that it is unwise to apply a

6. The difficulty and need for clear guidance here should not be discounted. As the majority briefly touched upon, this Court's search for the correct approach toward review of PERA arbitration awards has been difficult. *See* Majority op. at 75 and 75 n. 5, 52 A.3d at 1120 and 1120 n. 5.

7. This Court had previously rejected a reasonableness standard for review of PERA arbitration awards. *Westmoreland, supra* at 863.

reasonableness standard when a party asserts that an arbitration award violates public policy. An automatic unreasonableness standard would simply open the door for the same judicial meddling that this Court has time and again asserted is incompatible with PERA and its express public policy. Many arbitration cases concern issues of employee discipline, and if the losing party of an arbitration award could simply assert that the conduct leading to discipline violated public policy, then automatic review of the reasonableness of the award would necessarily thwart the swift and final resolution by the arbitrator that is contemplated and required by statute, collective bargaining agreement, and this Court's long-standing case law. Again, this Court must be mindful of the overarching principle that in the arena of PERA arbitration awards, it is the arbitrator who decides, and any judicial review must be limited and deferential.

Moreover, the majority opinion, in a footnote, asserts that United States Supreme Court decisions, some of which are directly cited to and relied upon by this Court in *Westmoreland*, are not relevant because they involve private employers under the National Labor Relations Act, while our case involves a public employer under PERA. Majority op. at 84 n. 13, 52 A.3d at 1125–26 n. 13. The majority states: "In the case of public employers, such as PHA, we may apply a less restrictive reading of the exception, and thus accord less deference to an arbitration award such as the inexplicable award at issue here." *Id.*

Respectfully, this assessment is made without any analysis, which is particularly troubling because it announces yet another shift in a standard of review adopted by our previous case law, without explaining how or why the previous standard is inadequate or unworkable. I see no reason for a change. The salient issue still remains, as the majority recognizes, whether the arbitration award here violated public policy. Unless grounded in specific law, public policy does not shift depending on whether the employer is private or public. Here, the public policy that is implicated is the prevention and discouragement of sexual harassment. Private employers are no more absolved of responsibility for activities that violate this

public policy than are public employers, nor are private employees given freer rein than public employees in this area. The public policy is the same, whether public or private. I therefore cannot join this shift in our standard.

Finally, the majority opinion states at one point that "termination is not required under the circumstances here." Majority op. at 81, 52 A.3d at 1124. However, an arbitrator would be hard pressed to come to any other conclusion after reading the majority opinion in its entirety. For example:

[W]e reject ... [the assertion] that a public employer can be precluded from taking such decisive action [*i.e.,* termination] against an employee following its investigation. A public employer should be empowered to implement a zero tolerance policy when appalling, assaultive, repeated sexual harassment is at issue. The arbitration award to the contrary in this case affirmatively encourages—indeed it rewards—sexual harassment in the public workplace.

*Id.* at 81, 52 A.3d at 1124–25.

Elsewhere, the majority writes: "[T]he arbitrator's decision to reinstate Mitchell undermined PHA's attempt to comply with its legal responsibilities to investigate and then provide a remedy." (*id.* at 82, 52 A.3d at 1124); "The absurd award here makes a mockery of the dominant public policy against sexual harassment in the workplace, by rendering public employers powerless to take appropriate actions to vindicate a strong public policy. Such an irrational award undermines clear and dominant public policy." (*id.* at 83, 52 A.3d at 1125); "Here, PHA did not attempt to supplant the parties' CBA without the union's consent [contrasting this case with a federal case]; instead, PHA applied the agreement's terms by discharging for "just cause" an employee who violated established policy." (*Id.* at 86, 52 A.3d at 1127).

Again, these examples demonstrate that the majority opinion has conflated judicially defined "public policy" with what the majority subjectively believes an employer "should" be able to do under circumstances such as those present in this case; the latter is explicitly not public policy. Moreover, it should be axiomatic that a reviewing court lacks the power to

determine whether the employer had "just cause" for terminating the employee. "Just cause" for termination is not a clearly established dominant public policy. It is a term found in the relevant collective bargaining agreement that the parties thereto have agreed would be, when an unresolved dispute arose, interpreted by an arbitrator, who would then **finally resolve** the dispute. When the arbitration award violates public policy, reviewing courts do not then step into the shoes of the arbitrator and decide the case or signal the preferred result. The role of the courts is far more limited, pursuant to PERA and our previous case law interpreting that act.

I believe that a resolution of the issue placed before this Court may be achieved in a manner that respects and adheres to the arbitration process as an instrument of public policy contemplated by PERA, and recognized by previous decisions of this Court. When a challenge is made that an arbitration award, which otherwise meets the essence test, violates a clear and dominant public policy of this Commonwealth, the court's review must proceed hand-in-glove with the overarching public policy of minimal interference with the arbitrator's role. PERA, and the parties through their collective bargaining process, have determined that **the arbitrator decides employment disputes, not the courts;** and a reviewing court, in exercising rare oversight, must never lose sight of this imperative. Implication of the public policy exception does not mean that the courts may now take over and decide the case.

Initially, the court must determine what, precisely, is the public policy implicated. Based on statutory and other authority, the public policy implicated in this case is clearly the prevention of sexual harassment. Secondly, where, as in this case, the discrepancy between **the arbitrator's** factual findings and his or her ultimate award establish that the clear and dominant public policy is thwarted, then a reviewing court will not engage in further review, but will simply vacate the arbitrator's award and remand to the arbitrator to fully consider the public policy consequences, pursuant to the court's guidance. The reviewing court's role is to harmonize, whenever possible, the dual public policy goals established by PERA

and the public policy that the PERA arbitration award purportedly violated. Again, courts must continue to be refrain from acting as "superarbitrators" or imposing their "own brand of labor relations philosophy" on the case. *State System of Higher Education, supra* at 413.

Further, I believe that this approach to the issue mirrors the approach that this Court adopted when it finally settled on the essence test:

First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement. **Regarding a review for reasonableness, . . . such review [is inappropriate, as] . . . it would invite a reviewing court to substitute its own interpretation of the contract language for that of the arbitrator.** Therefore, . . . **a court should not engage in merits review of the matter.** [T]he essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is 'manifestly unreasonable.'

*Westmoreland, supra* at 863 (quotation marks and citations to *State System of Higher Education, supra,* and other authority omitted; emphases added).

Thus, I would hold narrowly here that the arbitration award made pursuant to PERA failed to sufficiently consider the Commonwealth's strong public policy to prevent sexual harassment, thus implicating the **federal** public policy exception to the essence test, which was adopted by a majority of Justices in *Westmoreland, supra* at 865. Accordingly, I would affirm the Commonwealth Court only insofar as that court remanded the case for the arbitrator's re-evaluation of the clear public policy against sexual harassment, without sugges-

tion of the result that should be adopted after such re-evaluation. Because I believe that the majority opinion strays beyond this narrow holding in a number of troubling ways, and, in my respectful opinion, does not properly apply or consider the public policy exception to the essence test, I must concur only.

Justice BAER joins the Concurring Opinion.