# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny, Pennsylvania,    :
                      Appellant    :
                                  :
          v.                  :
                                    :
Allegheny County Prison          :    No. 1469 C.D. 2019
Employees Independent Union    :    Argued: October 13, 2020

BEFORE:    HONORABLE ANNE E. COVEY, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON          FILED: November 19, 2020

        The County of Allegheny, Pennsylvania (County) appeals the September 17, 2019 order of the Court of Common Pleas of Allegheny County (trial court) that denied the County's Petition to Vacate an arbitration award entered under the Public Employe Relations Act (PERA),[1] that sustained a grievance filed by the Allegheny County Prison Employees Independent Union (Union) seeking reinstatement of a terminated corrections officer Union member. Upon review, we affirm.

        The underlying facts of this matter are not in dispute. On the evening of June 3, 2017, Kenneth Goings (Goings) was working as a corrections officer on

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1011.101-1101.2301.

the medical unit of the Allegheny County Jail.[2] *See* Arbitration Decision and Award dated December 12, 2018 (Arbitration Award) at 2. Among Goings' duties as a corrections officer on the medical unit was a requirement that he perform guard tours[3] twice hourly. *See* Arbitration Award at 3. This guard tour requirement appeared in the medical unit's post orders,[4] which are orders posted in each pod that list all the required duties of the corrections officers assigned to the specific pod. *See* Arbitration Award at 3. Each corrections officer was required to read the post orders for their assigned pod on a daily basis and sign a sheet indicating they had done so. *See id.* When Goings began as a corrections officer on the medical unit in mid-2015, the post orders at the time had been in effect since July 6, 2015, and required only one guard tour per hour. *See* Arbitration Award at 3. The medical unit post orders were amended effective February 22, 2017, however, to require two guard tours per hour instead of one. *See id.* Despite regularly certifying by signing a sign-in sheet, as required, that he had read the post orders, Goings remained unaware of the change in the number of required guard tours by virtue of not having read the amended post orders. *See id.*

Sometime between Goings' 7:00 p.m. and 8:00 p.m. guard tours on the evening of June 3, 2017, an Allegheny County Jail inmate committed suicide in his

[2] The Allegheny County Jail employs a "pod" system in which inmates are placed in various pods – or groups of cells – based on the inmates' security levels. *See* Arbitration Award at 2. Goings' assigned pod, the medical unit pod, consisted of only 17 cells and was one of Allegheny County Jail's smaller pods. *Id.*

[3] Guard tours are walking rounds of assigned cell areas during which corrections officers visually check on cells and other areas under their supervision to ensure inmate safety and compliance with prison rules. *See* Arbitration Award at 3. Corrections officers press buttons throughout their pod during the guard tours that record the time they visit each area. *See id.*

[4] The medical unit post orders listed the two guard tours per hour requirement as order No. 8 on a list of 47 specific guard duties. *See* Arbitration Award at 3.

cell on the medical unit. *See* Arbitration Award at 4. As he usually did, Goings had signed the post order sign-in sheet, thereby indicating that he had read the post orders on June 3, 2017, despite the fact that he had not actually done so. *See id.* at 3.

Following a disciplinary hearing conducted on June 6, 2017, the County discharged Goings for failing to complete mandatory guard tours and for falsifying post order sign-in sheets that indicated Goings had daily read the post orders as required. *See* Arbitration Award at 4 & 9; Trial Court Rule 1925(a) Opinion dated January 6, 2020 (Trial Court Opinion) at 2. On June 7, 2017, the Union filed a grievance on Goings' behalf that alleged the County lacked just cause to discharge Goings and seeking Goings' reinstatement as a corrections officer with full back pay. *See* Arbitration Award at 2; *see also* Grievance filed June 7, 2017 (Grievance), Trial Court Reproduced Record (T.C.R.R.) at R133-34. After the Grievance was denied,[5] the Union sought to arbitrate the matter per the collective bargaining agreement in force between the County and the Union from 2014 through 2019 (CBA).

An arbitrator conducted a hearing on August 15, 2018, at which both Goings and the County were represented by counsel and presented evidence. *See* Arbitration Award at 2. On December 12, 2018, the arbitrator issued the Arbitration Award, which sustained the Grievance in part. *See* Arbitration Award at 2 & 12-13; Trial Court Opinion at 2. The arbitrator found Goings guilty of violating the post order requirement that he conduct two guard tours per hour and of repeatedly

---

[5] The Grievance underwent multiple levels of review and, following hearings at all levels, was denied at Level 1 on June 12, 2017, at Level 2 on June 30, 2017, and at Level 3 on July 31, 2017. *See* Letter of Simon Tyrone Wainwright dated June 12, 2017, Trial Court Reproduced Record (T.C.R.R.) at R135; Letter of Orlando Harper dated June 30, 2017, T.C.R.R. at R136; Letter of Steve Pilarski dated July 31, 2017, T.C.R.R. at R137-38.

falsifying the daily post order sign-in sheet indicating that he had read the post orders. *See* Arbitration Award at 9-12. The arbitrator determined that these violations represented significant misconduct that justified disciplinary action against Goings. *See id.* However, after examining multiple mitigating factors, the arbitrator determined that the County lacked just cause for terminating Goings' employment and converted Goings' termination to a 30-day unpaid suspension. *See id.* at 12. Accordingly, the arbitrator converted Goings' discharge to a 30-day suspension without pay and awarded Goings back pay.[6] *See id.* at 12-13.

The County filed a Petition to Vacate, which the trial court denied by order dated September 17, 2019. *See* Trial Court Order dated September 17, 2019 (Trial Court Order). In its Rule 1925(a) opinion, the trial court explained that the Arbitration Award in this matter satisfied the essence test in that the issue presented – termination for just cause – was within the terms of the CBA, and that the arbitrator's decision logically flowed from the terms of the CBA. *See* Trial Court Opinion at 4. Further, the trial court declined to invoke the public policy exception to the essence test, explaining that

> [t]he facts of this case, including the remedy imposed by the arbitrator (*i.e.*, mitigation of the discipline from termination to a thirty-day suspension and back pay), do not implicate a well-defined, dominant public policy warranting interference with the arbitrator's decision. Moreover, the arbitrator's decision in this case does not compel [the] County to violate any such policy.

---

[6] The Arbitration Award specifically limited Goings' back pay to his regular earnings less interim earnings and amounts received as unemployment compensation during the discharge period. *See* Arbitration Award at 12-13. The Arbitration Award expressly denied the Union's request that Goings also receive compensation for missed overtime opportunities he may have received during the discharge period. *Id.* at 13.

4

Trial Court Opinion at 4. The County appealed the Trial Court Order to this Court.

On appeal, the County claims that the trial court erred by denying its Petition to Vacate. Specifically, the County alleges that Goings' misrepresentations that he read post orders daily as required and his alleged false statements during testimony before the arbitrator represent violations of public policy that should have served as grounds for the trial court to vacate the Arbitration Award. *See* County's Brief at 3, 11-24.

Appellate review of a grievance arbitration award is generally conducted pursuant to the two-part "essence test." *Sch. Dist. of Phila. v. Phila. Fed'n of Teachers*, 164 A.3d 546, 552 (Pa. Cmwlth. 2017). Under the essence test,

> [f]irst, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof'l Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999); *see also Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007) (*Westmoreland I*). Thus, "[a]n arbitrator's award must be sustained 'if it is based on anything that can be gleaned as the 'essence' of the [collective bargaining agreement].'" *Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 98 A.3d 5, 14 (Pa. Cmwlth. 2014) (quoting *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 84, AFL–CIO*

*v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). Further, "[t]he essence test does not permit this Court to vacate an arbitrator's award even if we disagree with the arbitrator's interpretation of the [collective bargaining agreement]." *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 87 v. Cty. of Lackawanna*, 102 A.3d 1285, 1290 (Pa. Cmwlth. 2014) (citing *Cent. Susquehanna Intermediate Unit Educ. Ass'n v. Cent. Susquehanna Intermediate Unit # 16*, 459 A.2d 889, 890 (Pa. Cmwlth. 1983)). "The essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution." *Dep't of Corr., State Corr. Inst. at Forest v. Pa. State Corr. Officers Ass'n*, 173 A.3d 854, 858 (Pa. Cmwlth. 2017) (citing *Northumberland Cty. Comm'rs v. Am. Fed'n of State, Cty. & Mun. Emps., AFL–CIO Local 2016, Council 86*, 71 A.3d 367, 374 (Pa. Cmwlth. 2013)). The party challenging an arbitration award bears the "burden of proving the award does not draw its essence from the [collective bargaining agreement]." *See Pa. State Sys. of Higher Educ.*, 98 A.3d at 14.

However, even where an arbitration award satisfies the essence test, our Supreme Court has delineated a discreet exception whereby a reviewing court may still vacate the award if it violates public policy. *See Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1007-11 (Pa. 2019); *see also Westmoreland I*, 939 A.2d at 865-66. The application of this public policy exception requires that "[s]uch public policy . . . must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I*, 939 A.2d at 866. Additionally, unlike the deferential standard of review employed to review determinations under the essence test, appellate review of the public policy exception "lies in the proper application of the public policy exception to the essence

test.  This is a pure question of law; [the] standard of review is *de novo,* and [the] scope of review is plenary." *Phila. Hous. Auth. v. Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 33, Local 934*, 52 A.3d 1117, 1121 (Pa. 2012).  Further, our Supreme Court has expressly recognized that

> not only is the public policy exception "exceptionally narrow" in its own right, but it is also an exception to the essence test, which is itself a narrow exception to the doctrine that arbitration awards are final and binding.  A baseline recognition that the public policy exception is a narrow exception to a narrow exception must guide a reviewing court's analysis.

*Millcreek*, 210 A.3d at 1011 (internal citations omitted).

The Supreme Court has articulated a three-part test to determine the appropriate application of the public policy exception to the essence test.  *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011.

> First, a reviewing court must identify precisely what remedy the arbitrator imposed.  Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.  Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Id.* (emphasis, internal citations, and internal quotation marks omitted).  The Supreme Court further emphasized that "the arbitrator's interpretation of the contract controls during this entire analysis, which is only triggered upon the reviewing court's determination that the award satisfies the essence test, and should be upheld

7

absent a clear violation of public policy." *Id.* Moreover, "[t]he burden is on the party that opposes the award to demonstrate that it violates public policy." *Id.*

The instant matter involves Article XVIII of the CBA, which states that "[t]he Employer has the right to discharge or suspend any employee for just cause." CBA at 28, Supplemental Reproduced Record at R.2b. In reviewing the Arbitration Award, the trial court determined that the essence test was satisfied because the issue in this case was within the terms of the CBA and the Arbitration Award logically flowed from the terms of the CBA. *See* Trial Court Opinion at 4. Neither party disputes the trial court's conclusion that the essence test has been met. Therefore, the only question presently before this Court is whether the public policy exception to the essence test applies to this case. To make this determination, we review the facts of this case pursuant to the three-part *Millcreek* test.

1. *The precise remedy imposed by the arbitrator.*

The arbitrator in this matter reduced Goings' termination to a 30-day unpaid suspension with back pay. *See* Arbitration Award at 12-13. To the extent the County argues that the back pay awarded Goings in the Arbitration Award represents a "windfall payment of seventeen months of back pay" that should be considered part of the remedy fashioned in the Arbitration Award for purposes of the three-part *Millcreek* public policy exception test, we disagree. County's Brief at 17. The arbitrator concluded that the County had improperly terminated Goings' employment and converted Goings' discharge to the still significant penalty of a 30-day unpaid suspension. *See* Arbitration Award at 12-13. The fact that the arbitration process required by the CBA to reach this determination took 18 months was beyond Goings' control. Denying back pay for the entire period before the arbitration

8

decision would have effectively converted the 30-day unpaid suspension remedy fashioned by the arbitrator into an unpaid suspension throughout the entirety of the arbitration process, in this case 18 months' unpaid suspension. Here, the precise remedy imposed for consideration in this matter is the 30-day unpaid suspension with back pay.

2. *Whether the remedy implicates a well-defined, dominant public policy.*

Next, as the party that opposed the Arbitration Award, the County bears the burden of demonstrating that the Arbitration Award remedy implicates public policy. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011. As stated *supra*, in order for the public policy exception to the essence test to apply, the alleged public policy involved "must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I*, 939 A.2d at 866.

Our Supreme Court found the public policy exception to the essence test appropriately employed in *Philadelphia Housing Authority*, a case involving an employee whose "lewd, lascivious and extraordinarily perverse" conduct toward a co-worker without question amounted to sexual harassment. *See Phila. Hous. Auth.*, 52 A.3d at 1124-25. The Supreme Court reviewed relevant federal sexual harassment case law and recognized the existence of an explicit, well-defined, and dominant public policy against workplace sexual harassment "grounded in both federal and state law against sex discrimination in employment, including Title VII [of the Civil Rights Act of 1964], the regulations of the [federal Equal Employment Opportunity Commission], and [the Pennsylvania Human Rights Act]." *Id.* at 1123, 1127-28. The Court then found that the arbitration award reinstating the offending

9

employee with full back pay violated that well-defined, dominant public policy against sexual harassment. *See id.* The Court noted:

> To allow an arbitration award which finds that an employee engaged in "extraordinarily perverse" physical sexual harassment of a co-worker, yet then simply dismisses the conduct as unworthy of an employer response beyond initial "counseling," and reinstatement with back pay, would eviscerate the ability of employers to enforce dominant public policy.

*Id.* at 1125. The majority concluded that, considering the "egregious" nature of the employee's conduct, the arbitrator's award reinstating him "[made] a mockery of the dominant public policy against sexual harassment." *Id.* at 1128.

Following the Supreme Court's decision in *Philadelphia Housing Authority*, this Court took up the *Westmoreland I* remand in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA-NEA*, 72 A.3d 755 (Pa. Cmwlth. 2013) (*Westmoreland II*). Therein, the Court determined that the arbitrator's award that reinstated, with conditions, an elementary school teacher who had suffered a drug overdose while wearing a Fentanyl patch during the performance of her duties at school was in direct contravention of a well-defined, dominant public policy to protect school children from illegal drugs and drug use. *See Westmoreland II*, 72 A.3d at 759. Accordingly, the Court vacated the arbitrator's award as a violation of public policy. *See id.*

However, approximately six years later in *Millcreek*, the Supreme Court found that a school district failed to meet its burden to demonstrate that a specific duty to solicit subcontracting bids to present to a union in furtherance of good faith bargaining regarding subcontracting represented a dominant public policy

10

that triggered the application of the public policy exception to the essence test. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1012. The Supreme Court reviewed PERA and noted that section 701 of PERA, 43 P.S. § 1101.701, requires parties to a collective bargaining agreement to confer, in good faith, regarding multiple bargained-for aspects of collective bargaining agreements. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011. The Supreme Court further noted that a proposal to subcontract union work is a mandatory subject for bargaining that triggers the duty of good faith bargaining, and that the failure to so bargain represents an unfair labor practice. *Id.* at 1011-12. However, the Supreme Court concluded that even though an employer's duty to bargain in good faith may include a duty to provide a union with proposals submitted by subcontractors, this does not sufficiently demonstrate the existence of a well-defined, dominant public policy ascertained by reference to the laws and legal precedents that encompasses any specific duty on the part of the school district to solicit subcontracting bids and provide them to the union. *See id.* at 1012. The Supreme Court therefore determined that the school district failed to show "that any Pennsylvania statute or decision [] sets forth a clear requirement regarding the conduct at issue in this case[,]" and declined to employ the public policy exception to the essence test. *Id.*

To meet its burden in the instant matter, the County argues that, because Goings repeatedly signed the post order sign-in sheets indicating he had read the post orders on a daily basis when he had not, and because the arbitrator did not credit Goings' explanation of his failure to read the post orders, the arbitrator's remedy violates a "duty to provide truthful responses" and "precludes any expectation of a truthful discourse between employer and employee, much less a rational expectation of an honest exchange which must serve as the foundation for the employment

11

relationship." County's Brief at 17 & 24. To support the argument that the arbitrator's remedy violates a well-defined, dominant public policy requiring employee truthfulness, the County points to the existence of two offenses from Pennsylvania's Crimes Code[7] – tampering with public records or information, 18 Pa.C.S. § 4911,[8] and unsworn falsification to authorities, 18 Pa.C.S. § 4904[9] – as

---

[7] 18 Pa.C.S. §§ 101-9546.

[8] The Crimes Code defines the offense of tampering with public records or information as follows:

> **(a) Offense defined.**--A person commits an offense if he:
>
> (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;
>
> (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or
>
> (3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.

18 Pa.C.S. § 4911(a).

[9] The Crimes Code defines the offense of unsworn falsification to authorities as follows:

> **(a) In general.**--A person commits a misdemeanor of the second degree if, with intent to mislead a public servant in performing his official function, he:
>
> (1) makes any written false statement which he does not believe to be true;
>
> (2) submits or invites reliance on any writing which he knows to be forged, altered or otherwise lacking in authenticity; or

12

well as a provision of the Public Employee Pension Forfeiture Act[10] that references these crimes as possible grounds for the forfeiture of a public employee's pension benefits.[11] *See* County's Brief at 13-15. Effectively, the County argues that the existence of these criminal statutes and the Public Employee Pension Forfeiture Act evidences that a well-defined, dominant public policy of required truthfulness exists and condemns actions such as Goings' continued, knowing false certifications – by signing the post order sign-in sheets – that he had read post orders that he had not, in fact, read. *See id.*

The trial court, on the other hand, determined that

> (3) submits or invites reliance on any sample, specimen, map, boundary mark, or other object which he knows to be false.
>
> **(b) Statements "under penalty".**--A person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true, on or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable.

18 Pa.C.S. § 4904.

[10] Act of July 8, 1978, P.L. 752, *as amended*, 43 P.S. §§ 1311-1315.

[11] Section 3(a) of the Public Employee Pension Forfeiture Act provides that

> no public official or public employee nor any beneficiary designated by such public official or public employee shall be entitled to receive any retirement or other benefit or payment of any kind except a return of the contribution paid into any pension fund without interest, if such public official or public employee is found guilty of a crime related to public office or public employment or pleads guilty or nolo contendere to any crime related to public office or public employment.

43 P.S. § 1313(a). The Public Employee Pension Forfeiture Act includes both tampering with public records or information and unsworn falsification to authorities in the act's definition of crimes related to public office or public employment. *See* 43 P.S. § 1312.

13

> [t]he facts of this case, including the remedy imposed by the arbitrator (*i.e.*, mitigation of the discipline from termination to a thirty-day suspension and back pay), do not implicate a well-defined, dominant public policy warranting interference with the arbitrator's decision.

Trial Court Opinion at 4. We agree with the trial court that, under the facts of this case, the County has not met its burden to demonstrate that an alleged duty of employee/employer truthfulness constitutes a well-defined and dominant public policy ascertained by reference to laws and legal precedents. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1012.

Initially, while we appreciate that the arguable facial criminality of conduct may represent a consideration in determining whether a well-defined, dominant policy exists for the purpose of applying the public policy exception to the essence test,[12] the existence of defined offenses under the Crimes Code that involve dishonesty that could arguably be applied to Goings' behavior in the instant matter does not mandate the application of the public policy exception. The General Assembly did not enact the crimes of tampering with public records and unsworn falsifications to authorities to impose a strict requirement of honesty in all interactions between employers and employees or to otherwise control oversight of errors in employment paperwork, even where deliberate. The existence of the public policy the County identifies – a requirement of truthfulness between employee and employer – simply cannot be gleaned from the mere existence of either these criminal provisions or the portion of the Public Employee Pension Forfeiture Act that references the crimes. Beyond blanket implications that the crimes of tampering

---

[12] *See Phila. Hous. Auth.*, 52 A.3d at 1125 (noting that a public employer should have power to impose consequences for extremely inappropriate, and facially criminal, conduct).

14

with public records and unsworn falsifications to authorities punish dishonesty, the County did not elaborate on how the listed crimes bear on Goings' specific behavior of falsely filling out his employer's paperwork.

Additionally, we note that Goings was not charged with, much less convicted of, any crimes in this matter. While the arbitrator did find that Goings repeatedly failed to read the post orders and repeatedly falsified the post order sign-in sheet, and further that such failures "provided just cause for significant disciplinary action[,]"[13] the arbitrator in no way determined, as the County suggests,[14] that Goings violated criminal law. Instead, the arbitrator ultimately concluded that Goings' repeated falsification of post order sign-in sheets indicating he had read the post orders – although "significant misconduct" – amounted to negligence in attending to his employment duties, as opposed to any specific intent to commit the crimes of unsworn falsifications to authorities or tampering with public records. *See* Arbitration Award at 10 & 12.

The arbitrator found that Goings violated a management directive by knowingly falsifying the post order sign-in sheets to indicate that he had read the post orders each shift. *See* Arbitration Award at 9. However, the arbitrator went on to state this was an aggravating factor to be considered "in determining the appropriate penalty for [Goings'] negligent actions." *Id.* at 10. The arbitrator also

---

[13] Arbitration Award at 9.

[14] The County states that the arbitrator "determined that Goings . . . [k]nowingly and intentionally violated not only Allegheny County Jail rules and regulations against falsification, but also criminal law prohibiting such conduct[.]" County's Brief at 17. The County further states that the arbitrator made an "unqualified determination that Goings violated [] County policy and very likely the criminal code[.]" *Id.* These statements are not supported by the Arbitration Award, which makes no reference whatsoever to any criminal statute or violation and properly contains the conclusions therein to a discussion of the facts of this case. *See* Arbitration Award at 9-13.

15

noted several mitigating factors, including Goings' 19 years of service with only two minor counseling sessions, the lack of supervisory oversight in Goings' actions, and the lack of any discipline of the supervisors who were responsible for insuring Goings' compliance with the post orders. *Id.* at 10-11. Given these factors, the Arbitration Award stated:

> It is therefore concluded that [Goings'] engaged in significant misconduct that provided just cause for discipline. However, given the equivalent negligence of supervisory personnel in failing to catch [Goings'] error and the County's failure to act against them, there was not just cause for discharge.

Arbitration Award at 12.

Also, despite largely basing its appellate argument on Goings' falsification of the post order sign-in sheets, and despite the existence of a specific Code of Ethics provision allowing for discipline of prison employees for falsifying information on reports,[15] the County did not list falsification of reports as a reason for the discipline imposed. *See* Letter of Matt Kohler dated June 5, 2017, Reproduced Record (R.R.) at 26a; Letter of Matt Kohler dated June 6, 2017, R.R. at 27a. Instead, Goings was charged with, and ultimately discharged for, violation of the requirement contained in Post Order No. 8, that guards in the medical unit conduct two guard tours per hour, as well as failure to comply with written directives

---

[15] Section 3.14 of the County's Code of Ethics provides as follows:

> Any employees found to have falsified information on reports, will be subject to severe disciplinary action inclusive of termination, regardless of when discovered. This includes pre-employment information (written and verbal).

Code of Ethics at 9, Reproduced Record at 42a.

16

(the post orders), and Code of Ethics Sections 2.1 and 2.3,[16] which require that employees be familiar with, and carry out, their duties. *See* Letter of Matt Kohler

[16] The Code of Ethics Section 2.1 provides:

> 2.1 ALL EMPLOYEES SHALL:
>
> a. Be thoroughly familiar with their duties and responsibilities. Employees are required to review all announcements, memos, [and] directives that were issued while they were off duty for any period of time.
>
> b. Be knowledgeable of and enforce the rules and regulations governing the inmate population.
>
> c. Be knowledgeable of and enforce the rules and regulations governing the jail staff and visitors.
>
> d. Be friendly, but professional, maintaining an impersonal attitude and relationship toward all inmates, remaining always impartial.
>
> e. Never strike an inmate, except in self-defense and then only using that degree of force necessary to control or contain the situation.
>
> f. Never enter into any transaction or relationship with any inmate, or ex-inmate on parole or probation.
>
> g. Never verbally abuse or agitate an inmate.
>
> h. Never take anything for granted, always investigate and get all the facts.
>
> i. Never overlook the potential of any situation and act affirmatively to report and/or eliminate conditions that could lead to serious and dangerous incidents. This includes potential safety risks due to personal grooming and/or attire.

Code of Ethics at 4, R.R. at 37a. Section 2.3 of the Code of Ethics provides as follows:

> 2.3 ALL EMPLOYEES SHALL CARRY OUT ALL ORDERS AND DIRECTIVES:
>
> a. All employees will carry out all orders and directives issued or given them by a supervisor, in a prompt and efficient manner.

17

dated June 5, 2017, R.R. at 26a; Letter of Matt Kohler dated June 6, 2017, R.R. at 27a. The County cannot add, on appeal, a reason for discharge not presented to the arbitrator. *See* R.R. at 23a (Step 1 of Grievance Procedure requires citation to the CBA provisions believed to be violated); *see also Pa. State Corr. Officers Ass'n v. Commonwealth*, 976 A.2d 1236, 1239 (Pa. Cmwlth. 2009) ("issues not raised before the arbitrator are waived on appeal before this Court").

Further, we find unpersuasive the County's argument that the public policy exception to the essence test should be employed in this case because the arbitrator refused to credit Goings' proffered reason for his failure to read the post orders–that he lacked time–and, therefore, Goings was dishonest with his employer. *See* County Brief at 16-17. To conclude a well-defined, dominant public policy for truthfulness to one's employer validates the use of the public policy exception to the essence test every time an arbitrator makes a credibility determination adverse to the employee would allow for an overly broad use of the exception. Such a result is completely contrary to Supreme Court precedent establishing that the public policy exception is an especially narrow exception to the already narrow exception to the

DISREGARD OF ORDERS AND DIRECTIVES ISSUED BY A SUPERVISOR IN A WILFUL OR DILATORY MANNER WILL BE CAUSE FOR SEVERE DISCIPLINARY ACTION UP TO AND INCLUDING DISCHARGE.

b. Insubordination in any fashion will not be tolerated. All employees will render due respect to all supervisory staff and will carry out all orders and instructions given. No staff member will engage in making derogatory remarks or discrediting statements or slanderous gossip, concerning supervisors, nor their orders or instructions. Disregard of such, will be cause for severe disciplinary action up to and including termination.

Code of Ethics at 5, R.R. at 38a.

18

doctrine that arbitration awards are final and binding. *See Millcreek Twp. Sch. Dist.*, 210 A.3d at 1011.

3. *Whether the Arbitration Award compels violation of a well-defined, dominant public policy.*

Even assuming the existence of the alleged well-defined, dominant public policy requiring truthfulness between employers and employees, the Arbitration Award in this case would not violate such a policy. An arbitrator's award will be found in violation of a stated public policy where it makes a mockery of, or causes an employer to violate, an implicated public policy. *See Phila. Hous. Auth.*, 52 A.3d at 1125 (finding absurd and a mockery of the dominant public policy against sexual harassment an award that reinstated, with full back pay, an individual whose egregious conduct amounted to sexual harassment). The award in this matter does neither.

The arbitrator herein imposed a 30-day unpaid suspension based on Goings' significant misconduct. *See* Arbitration Award at 12-13. In fashioning this remedy, the arbitrator considered certain aggravating factors: (1) the death of the inmate, and (2) the fact that Goings lacked sufficient excuse to justify his repeated misconduct. *See* Arbitration Award at 10. As mitigating factors, the arbitrator considered: (1) Goings' employment longevity and clean work record; (2) the lack of supervisory oversight of Goings' work performance; and (3) the lack of discipline of any superiors responsible for oversight of Goings' work performance. *See* Arbitration Award at 10-11. Despite the gravity of the tragedy of the inmate death in this matter, the imposition of a 30-day unpaid suspension represents a significant penalty for Goings' actions, which the arbitrator ultimately characterized as negligent. *See* Arbitration Award at 12. As the trial court noted – in addition to not

implicating any well-defined, dominant public policy – the arbitrator's remedy would in no way, under the facts of this case, make a mockery of the alleged public policy of required truthfulness between employer and employee, if such a policy existed, nor would it require that the County violate such a policy. *See* Trial Court Opinion at 4.

We note further that Goings' actions and the penalty imposed herein are simply not comparable to the actions of the employee or the remedy in *Philadelphia Housing Authority*. A 30-day unpaid suspension for employee dishonesty in an employment relationship in no way eviscerates the County's ability to enforce any public policy. *See Phila. Hous. Auth.*, 52 A.3d at 1125. The serious nature of the tragic death of the inmate in this matter notwithstanding, unlike the reinstatement without other consequences awarded in *Philadelphia Housing Authority*, the Arbitration Award does not require that the County violate public policy.

For the above reasons, we affirm the order of the trial court denying the County's Petition to Vacate the Arbitration Award.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny, Pennsylvania,    :
            Appellant    :
                                :
        v.               :
                                :
Allegheny County Prison    :   No. 1469 C.D. 2019
Employees Independent Union   :

## O R D E R

AND NOW, this 19th day of November, 2020, the September 17, 2019 order of the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge