# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pennsylvania State System of Higher Education, Kutztown University, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 961 C.D. 2022 |
| | : | ARGUED: November 6, 2023 |
| Pennsylvania State System of Higher Education Officers Association, | : | |
| Respondent | : | |
| | : | |
| PASSHE Officers Association, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1178 C.D. 2022 |
| | : | |
| Pennsylvania State System of Higher Education, Kutztown University, | : | |
| Respondent | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE STACY WALLACE, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**[1]                          **FILED:  May 1, 2024**

The Pennsylvania State System of Higher Education (PASSHE), Kutztown University, petitions for review of the August 12, 2022 arbitration award, in which the Arbitrator sustained a grievance filed by the PASSHE Officers Association on behalf of Alan Swartz (Grievant).  In its grievance, the Association challenged Grievant's placement on administrative leave and subsequent

---

[1] This case was reassigned to the authoring judge on November 22, 2023.

termination for posts Grievant made to his public Facebook page. The Arbitration Award directed the University to reinstate Grievant to his former position as a police officer and provide him full back pay, benefits, and seniority lost due to his termination. On appeal, PASSHE argues the Arbitration Award violates public policy and should be reversed. The Association filed a Cross-Petition for review requesting that this Court confirm the Arbitration Award and order PASSHE to comply with its terms. After review, we conclude the Arbitration Award violates the dominant, well-defined public policy against discrimination and therefore vacate the arbitration award. We further dismiss the Cross-Petition as moot.

## I. Background

The facts as set forth in the Arbitration Award may be summarized as follows. PASSHE administers the Commonwealth-wide system of 14 public universities, which includes the University. Reproduced Record (R.R.) at 519a. The Association represents the bargaining unit of police and security personnel, including Grievant, assigned to universities throughout the system. *Id*. Grievant is a non-supervisory police officer who has been employed as a patrol officer with the University since 2012. *Id*. at 520a. The main job duties of University patrol officers are to patrol campus and interact with the community, respond to police calls, investigate crimes, and testify in court. *Id.* at 114a, 853a-54a. Grievant also served as president of the Association for the three years prior to the termination of his employment. *Id.* at 520a.

PASSHE negotiated the current collective bargaining agreement (CBA) with the Association. R.R. at 519a. The CBA governs the terms and conditions of employment between PASSHE and Grievant. In relevant part, Article 37 of the CBA includes a grievance and arbitration procedure to resolve contractual disputes,

2

*id.* at 655a, and Article 27 of the CBA prohibits PASSHE from terminating an employee without "just cause." *Id.* at 653a.

On February 3, 2021, a group of anonymous student and faculty social justice activists, known as the "KU Activists," who maintain a website and Instagram account monitored by the University, posted several screenshots taken from Grievant's Facebook page to their Instagram account page. R.R. at 521a. The Arbitrator described the KU Activists' posts as follows:

> The first two posts contained an introductory paragraph that stated the following:
>
>> [The] University hired [Grievant] to protect [the University's] students and community. Trigger warning, as throughout this post, you will see homophobic, Islamophobic, racist and insurrection supporting content posted by this man hired to protect us. As college students, we are told to monitor what we post online due to the fact that future empolyers [sic] could see it. Either [the] University saw this and found no issue with this content he posted for anyone to find on his public Facebook [page] or did not [undertake] proper background checks on a man hired to keep us safe. What's worse? How can we trust [the University police] to protect [] University students if they hire officers who post things like this publicly? This man poses a severe safety threat to our community. Sign the petition in bio to call on [the] University to do something about this. We cannot allow officers to "protect" our students while supporting this type of content. [The University] needs to address this and commit to protecting our students.

3

This introductory paragraph bracketed a series of posts by [] Grievant. The first contained a photo of him identifying himself as a [University] police officer.

The second post was a compilation of three screenshots of [] Grievant's posts. One post stated that "the same people who think Trump is mentally ill also think . . . there are more than [two] genders, guns kill people, illegal immigrants are legal, abortions are justified, walls are immoral, higher taxes are good, Obamacare works, disrespecting our anthem is ok[ay]." The second post was of the Confederate Flag and stated that it was posting "this historical flag to offend the ignorant people." The third said, "why are y'all crying about Kyle Shooting 3 thugs? This is how shit goes down in a country with no police make up your mind. Can't have it both ways."[2]

What followed was a series of Instagram posts showing other screen[shots] and labeling them as examples of islamophobia,[2] racism,[3] supporting the terrorist attack against the government, and supporting conspiracies about the government.

FN2 – "Every time a Moslem [person] stands up in Congress and tells us they will change the Constitution, impeach our president or vote for Socialism, remember you said you would never forget. They said they would destroy us from within[.]" [Accompanied by, *inter alia*, pictures of the World Trade Center towers burning and two members of Congress.]

FN3 – "Mexican word of the Day, 'Bodywash[,'] Biden was on TV but no Bodywash him."

*Id*. at 521a-23a (footnote added).

After the KU Activists published Grievant's Facebook posts to their Instagram page, the University received numerous complaints from students and

---

[2] This post appears to depict Kyle Rittenhouse when he shot three individuals in August 2020 during protests regarding the police shooting of Jacob Blake in Kenosha, Wisconsin.

4

faculty members, and several thousand individuals signed petitions demanding the University remove Grievant from his position as a University police officer. R.R. at 528a-31a. On February 8, 2021, the University placed Grievant on administrative leave pending an investigation into his Facebook posts. *Id*.

During the investigation, members of the University's administration reviewed the posts and concluded Grievant's social media page was "racial, homophobic, and discriminatory while identifying himself as a [University] police officer." R.R. at 531a. Particularly troubling given Grievant's position as a police officer are his posts disparaging various minority members of society and posts pertaining to excessive use of force by police, including those pertaining to media coverage of police-involved shootings. One especially chilling post stated: "If you don't listen to a police officer's orders, what happens to you is your fault. No matter what color your skin is." *Id.* at 740a. Another post referred to people of color and stated, in part: "You rob us, car jack us, and shoot at us. But, when a white police officer shoots a black gang member or beats up a black drug dealer running from the law and posing a threat to society, you call him a racist." *Id.* at 797a. Grievant also posted an image depicting a noose and multiple posts downplaying the severity of the January 6, 2021 attack on the United States Capitol. *Id.* at 526a, 528a, 761a, 796a.

At a pre-disciplinary conference, Grievant acknowledged that he shared the posts to his Facebook page, which reflected his political opinions, and explained he was unaware of any policy prohibiting him from doing so. R.R. at 533a; *see also id.* at 209a-10a. Additionally, Grievant noted during his years of service and regular interaction with members of the University community, he had never been disciplined for his conduct as a police officer. *Id*. at 533a.

5

On April 21, 2021, the University terminated Grievant's employment. R.R. at 532a. The termination letter issued by the University's Director of Human Resources explains that because of Grievant's Facebook posts, "concerns were raised about [his] ability to effectively perform [his] job as a police officer without treating students disparately." *Id.* at 659a; *see also id.* at 532a. The termination letter provided the reason for the University's action was its "loss of confidence in [Grievant's] ability to effectively perform [his] job as a police officer and the significant disruption to the [U]niversity caused by the posts [he] made . . . about race, national origin, and gender identity." *Id.* Moreover, the posts "eroded [his] credibility, the trust placed in [him] by members of the [U]niversity community, and the [U]niversity's confidence in [his] ability to effectively carry out [his] responsibilities as a police officer sworn to protect and serve all students, faculty, and staff." *Id.* at 660a. That same day, the Association filed a grievance claiming the termination was without just cause, in violation of the CBA. *Id.* at 518a. Unable to resolve the grievance, the parties proceeded to arbitration. *Id.* at 520a.

The Arbitrator held a hearing over the course of three days in January 2022 and framed the sole issue before him as whether the University terminated Grievant for just cause. R.R. at 518a. On August 12, 2022, the Arbitrator issued the Arbitration Award sustaining the grievance and ordering that Grievant be reinstated with full back pay, as well as full benefits and seniority lost due to the termination. *Id.* at 550a.

In sustaining the grievance, the Arbitrator stressed that the University's lack of a social media policy meant Grievant was not put on notice that his off-duty Facebook posts were inappropriate and could result in discipline. The Arbitrator explained that while he found many of Grievant's posts to be offensive to members

6

of the University community, as well as the public at large, the posts "were not so inappropriate that no policy was needed to notify [Grievant] that his posts would result in discipline," noting that "controversial posts may be seen as acceptable by some but not others." R.R. at 539a. The Arbitrator emphasized that some guidance, in the form of a policy or directive, was necessary to put Grievant and other employees on notice that their social media activity could impact their employment. *Id*. at 543a.

PASSHE now appeals to this Court.

## II. Issue

On appeal, PASSHE raises one question for our consideration, whether the Arbitration Award reinstating Grievant to his role as a University police officer violates public policy. Specifically, PASSHE articulates the question as:

> Does the [Arbitration Award], reinstating [Grievant] to a position of a police officer with [the] University Police Department, violate the well-defined public policy of the Commonwealth when [Grievant] publicly posted and shared on Facebook racist and inflammatory images and comments attacking protected classes of minorities, members of the LGBTQ+ community, and immigrants?

PASSHE's Br. at 5. PASSHE argues that Grievant's conduct and the Arbitration Award implicate the well-defined and dominant public policy of prohibiting discrimination, especially in police departments. *Id*. at 38, 41. The Arbitration Award reinstating Grievant to his police officer position, with full back pay and benefits, contravenes this public policy and therefore should be vacated.

In response, the Association stresses that the Court's role is to determine whether the Arbitration Award itself, rather than Grievant's conduct, violates public policy. Ass'n's Br. at 16. According to the Association, the

7

Arbitration Award does not violate public policy because it does not demonstrate a tolerance for offensive online conduct, but rather requires that employers afford employees due process before terminating them. *Id.* at 22. The Arbitrator determined that the University's lack of a social media policy meant that Grievant was not put on notice that his off-duty Facebook posts could subject him to discipline. Further, because the Arbitration Award does not hinder the University from enforcing policies against discrimination or harassment, it does not disregard the University's mission of fostering a diverse campus where students of various backgrounds can feel safe. *Id.* at 24.[3]

### III. Discussion

Our review of a grievance arbitration award under the Public Employe Relations Act (PERA)[4] "is the highly circumscribed 'essence test[.]'" *City of Bradford v. Teamsters Loc. Union No. 110*, 25 A.3d 408, 412 (Pa. Cmwlth. 2011) (*en banc*). Under this two-prong test, a reviewing court must first "decide whether the issue is encompassed by the CBA," and "second, the court must uphold the arbitrator's award if the arbitrator's interpretation can rationally be derived from the CBA." *Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 996 (Pa. 2019).

Neither party asserts that the Arbitration Award violates the essence test. Rather, the crux of the appeal is the public policy exception to the essence test first recognized by our Supreme Court in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855 (Pa. 2007) (*Westmoreland I*)

---

[3] Additionally, in its Cross-Petition, the Association requests that this Court confirm the Arbitration Award and enter judgment ordering PASSHE to abide with same.

[4] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

(plurality). In general, even if an award satisfies the essence test, this exception "prohibit[s] a court from enforcing an arbitrator's award that contravenes public policy." *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334, 338 (Pa. Cmwlth. 2017) (*en banc*) (quotation omitted). More specifically, the public policy exception requires the application of the following three-part test:

> First, a reviewing court must identify precisely what remedy the arbitrator imposed. Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Cnty. of Allegheny v. Allegheny Cnty. Prison Emps. Indep. Union*, 244 A.3d 873, 879-80 (Pa. Cmwlth. 2021) (quoting *Millcreek*, 210 A.3d at 1011). The burden of establishing a violation of public policy rests on the party asserting the public policy exception. *Westmoreland I*, 939 A.2d at 864. Unlike the deferential standard of review employed for determinations under the essence test, our review of the public policy exception "lies in the proper application of the public policy exception to the essence test. This is a pure question of law; [the] standard of review is *de novo*, and [the] scope of review is plenary." *Phila. Housing Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 33, Loc. 934*, 52 A.3d 1117, 1121 (Pa. 2012).

This test "draws the necessary balance between the public employer's duty to protect the health, safety and welfare of the citizens it serves, the fair treatment of public employees and the salutary goal of PERA to insure the prompt resolution of labor disputes in binding arbitration." *City of Bradford*, 25 A.3d at 415.

9

While the public policy "exception is a narrow one, we are not to interpret it so narrowly 'that it would be, as a practical matter, completely negated.'" *Neshaminy Sch. Dist.*, 171 A.3d at 338 (quoting *Phila. Housing Auth.*, 52 A.3d at 1125).

Regarding the first prong, the precise remedy imposed by the Arbitrator in this matter was reinstating Grievant to his position as a University police officer with full back pay and benefits, that is to say with no consequences. R.R. at 550a. The parties do not dispute the nature of the conduct that led to the termination of Grievant's employment – that being the numerous posts he made to his public Facebook page, where he also identified himself as a University police officer. While the parties differ in how they characterize or interpret those posts, it is undisputed that Grievant posted the material. *See* R.R. at 530a-31a, 209a-10a.

As to the second prong, whether the conduct implicates a well-defined public policy as opposed to "general considerations of supposed public interests," we agree with PASSHE that there is a dominant public policy interest in prohibiting discrimination. *Neshaminy Sch. Dist.*, 171 A.3d at 338. Both federal and state law, and legal precedents interpreting same, are replete with evidence of such policy, including the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,[5] article I, sections 1 and 26 of the Pennsylvania Constitution,[6] and the Pennsylvania Human Relations Act (PHRA).[7] *See* PASSHE's Br. at 38-40.

Notably, the University Police Department's own disciplinary policy prohibits discrimination "against any person because of age, race, color, creed, religion, sex, sexual orientation, national origin, ancestry, marital status, physical or

---

[5] U.S. CONST. amend. XIV, § 1.

[6] Pa. CONST. art. I §§ 1, 26.

[7] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

10

mental disability or medical condition." R.R. at 856a. The disciplinary policy warns that a violation thereof, including one based upon off-duty conduct, could result in a range of disciplinary measures, up to and including discharge. *See id.* at 860a; *see also Phila. Housing Auth.*, 52 A.3d at 1124. PASSHE's classification specification for the position of patrol officer lists under the heading required knowledge, skills and abilities: "Ability to enforce laws firmly, tactfully, and with respect for the rights of others." R.R. at 854a. It further provides that all assignments of a patrol officer "involve responsibility for recognizing the social importance of police functions" and "for tactful and courteous treatment of the general public[.]" *Id.* at 853a. In sum, it is beyond question that the public policy of prohibiting discrimination is well-defined and established.

Moreover, the remedy here clearly implicates this public policy. As the Arbitrator himself concluded, based upon his thorough review of the record, "[t]here is no question about the University's commitment to its mission of working toward diversity[,] inclusion and belonging." R.R. at 548a. He further explained that

> [t]he University has a vital interest in providing safe and welcoming space for students from diverse backgrounds. The evidence established that the University has demonstrating [sic] that interest by investing in programs geared to the recruitment and support for students of rising identities. The record is full of examples particularly through statements issued by the University Administration showing support for its students and their efforts to seek social justice in the community. *The Grievant's Facebook posts, even though he may think are his personal musings and political expression*[,] *are contrary to the* [sic] *stated interests*. Once uncovered by a group of activists, those statements have become a source of complaint and concern throughout the University.

11

*Id.* at 541a-42a (emphasis added).

The real disagreement here involves the third prong of the exception, namely "whether, given the circumstances involved and [the a]rbitrator's factual findings, the [a]ward 'poses an unacceptable risk that it will undermine the . . . policy' against [discrimination] and cause [the University] to breach its lawful obligations or public duty. *City of Bradford*, 25 A.3d at 414. If it does, the [a]ward should not be enforced." *Neshaminy Sch. Dist.*, 171 A.3d at 338. In this context, "[w]e acknowledge that courts are to give arbitration awards deference and are not to second-guess an arbitrator's findings of fact or interpretations." *Id.* at 340. Nonetheless, an arbitration award "is not entitled to a level of devotion that makes a mockery of the dominant public policy" at issue. *Phila. Housing Auth.*, 52 A.3d at 1127-28. It also bears repeating that whether the public policy exception applies is a pure question of law. *See, e.g.*, *id.* at 1121.

Here, the Association would have the Court completely remove consideration of Grievant's conduct from the inquiry. This approach overly simplifies the matter. Rather, as our Supreme Court has advised, "the rational way to approach the question is to recognize the relationship between the award and the conduct; and to require some reasonable, calibrated, defensible relationship between the conduct violating dominant public policy and the arbitrator's response." *Id.* at 1128. Indeed, the third prong of the public policy exception requires that we consider "the particular circumstances and the factual findings of the arbitrator." *Cnty. of Allegheny*, 244 A.3d at 879-80. Therefore, when "evaluating whether an arbitration award violates a dominant public policy, reviewing courts consider 'both aggravating and mitigating factors in determining whether an award poses an

12

unacceptable risk that a clear public policy will be undermined if the award is implemented.'" *Id.* at 881 (quoting *Neshaminy Sch. Dist.*, 171 A.3d at 340).

It is important to note that we are not dealing with an isolated incident here or a single lapse in judgment. To the contrary, the University's investigation uncovered more than 40 Facebook posts made over an extended period of time, notably one in which our nation was grappling with racial tension and political protests stemming from several high-profile police-involved shootings, including the murder of George Floyd. *See* R.R. at 520a, 529a-31a, 541a-42a. The Arbitrator credited the testimony of the University's witnesses regarding the work the University was doing during that time to assure community members of its commitment to diversity, inclusion, and belonging, and that the University was a safe space for all to work and study. Grievant's posts demonstrate a course of conduct contrary to the University's mission, which serves to undermine the work the University was doing in this regard.

In his analysis, the Arbitrator stressed the "evolving line" between political speech and what we consider offensive speech, finding that *several* of Grievant's posts merely contained political commentary that not everyone would find objectionable. R.R. at 543a. Yet, the Arbitrator also found "that *many* of [] Grievant's posts *are offensive to many members* of the University community as well as members of the public at large." *Id.* at 549a (emphasis added). To be clear, the bulk of the material Grievant willingly chose to post to his Facebook page espoused hateful and discriminatory beliefs towards members of multiple minority communities. Grievant's posts pertaining to police-involved shootings and excessive force are simply beyond the pale. As the University's Director of Human Resources succinctly explained, "an officer showing racism is a foundational

13

violation[.]" *Id.* at 532a. No employer, even one bound by a collective bargaining agreement, should be forced to retain an employee so diametrically opposed to that employer's mission.[8] The Arbitration Award reinstating Grievant to his position of patrol officer with full back pay and benefits – indeed, without *any* sanction whatsoever – "demonstrated a tolerance, rather than intolerance for" discrimination, "and is in direct contravention of public policy." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA-NEA*, 72 A.3d 755, 757 (Pa. Cmwlth. 2013) (*Westmoreland II*).

The Arbitrator's determination regarding due process misses the mark as Grievant was neither cited for nor terminated based upon a specific violation of the University Police Department's disciplinary policy. Moreover, the University's lack of a specific policy regarding social media is not determinative given the dominant, well-defined public policy prohibiting discrimination, which is amplified in the area of policing where individual liberties and rights are at stake. The University Police Department's disciplinary policy repeatedly states that off-duty conduct may be cause for disciplinary action. R.R. at 855a ("Failure of any employee to meet the guidelines set forth in this policy, whether on-duty or off-duty, may be cause for disciplinary action."); *id.* ("An employee's off-duty conduct shall be governed by this policy to the extent that it is related to act(s) that may materially

_____

[8] While not directly on point, caselaw interpreting the First Amendment, U.S. CONST. amend. I, is instructive and makes clear that "expressive rights are 'not absolute.'" *Commonwealth v. Knox*, 190 A.3d 1146, 1154 (Pa. 2018) [quoting *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002)]. *See also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011) (noting in the First Amendment context, that we must "reconcile[] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission"); *id.* at 386-87 ("When someone who is paid a salary so that []he will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain h[im].") (quotation omitted).

14

affect or arise from the employee's ability to perform official duties or to the extent that it may be indicative of unfitness for his/her position."). As stated above, PASSHE's classification specification for the position of patrol officer confirms that officers must perform their duties "with respect for the rights of others." *Id.* at 854a; *see also id.* at 853a (all assignments of a patrol officer "involve responsibility for recognizing the social importance of police functions" and "for tactful and courteous treatment of the general public").

Members of the University's community have a right to expect that they will be treated equally by law enforcement officers, including Grievant, without regard to who they are or what they believe. The University rightfully determined that Grievant's posts call into question his ability to do so and instill a lack of confidence among the diverse members of the University community he is sworn to protect.[9] The Arbitration Award forcing the University to reinstate Grievant to his position as a police officer with full back pay and benefits, without even any mandatory training to address these issues – indeed, without *any* penalty at all –

---

[9] Contrary to the Dissent's suggestion, this Court is not replacing the Arbitrator's judgment with its own. Rather, by vacating the Arbitration Award because it violates the dominant public policy against discrimination, we are merely allowing the University's initial determination to stand – that being the termination of Grievant's employment. Controlling precedent from our courts does not countenance a remand but instead provides that an award which violates public policy must not be enforced. *See, e.g.*, *Phila. Housing Auth.*; *Neshaminy Sch. Dist.*, 171 A.3d at 343 (concluding that an arbitration award reinstating with backpay, minus a 20-day suspension, a teacher who sexually harassed a co-teacher "violates the well-established and dominant public policy against sexual harassment and *must not be enforced*") (emphasis added); *Westmoreland II*, 72 A.3d at 759 (holding that because arbitration award violated well-defined public policy to protect school children from illegal drugs and drug use "[i]t must not be enforced" and, therefore, vacating award). Like our Supreme Court explained in *Philadelphia Housing Authority*, "[a]lthough we do not hold that termination was required under the circumstances here, we likewise reject the arbitrator's and appellant's counter-assertion that a public employer can be precluded from taking such decisive action against an employee following its investigation." 52 A.3d at 1124. Put simply, the Dissent's suggested disposition of remanding to the Arbitrator under such circumstances runs contrary to precedent and is based upon non-binding minority opinions.

sanctions Grievant's open expression of hate speech and, accordingly, allows it to continue, causing the University community, and particularly minority students, to fear rather than rely on the police who are supposed to protect them. Not only will the policy against discrimination be undermined, but it cannot be denied that, in today's environment, hate speech which the speaker may see as only an expression of opinion often leads others to commit overt discriminatory, if not violent, action. In this way the award itself violates the well-defined and dominant public policy against discrimination, a public policy which is grounded in both federal and state law. *See Phila. Housing Auth.*; *Neshaminy Sch. Dist.*; *Westmoreland II*.

### IV. Conclusion

Accordingly, we grant PASSHE's Petition for Review and vacate the Arbitration Award. The Association's Cross-Petition is dismissed as moot.

 

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of Higher : 
Education, Kutztown University, : 
                     Petitioner : 
                         : 
               v. :     No. 961 C.D. 2022 
                         : 
Pennsylvania State System of Higher : 
Education Officers Association, : 
                    Respondent : 

PASSHE Officers Association, : 
                    Petitioner : 
                         : 
               v. :     No. 1178 C.D. 2022 
                         : 
Pennsylvania State System of Higher : 
Education, Kutztown University, : 
                    Respondent : 

# **O R D E R**

AND NOW, this 1st day of May, 2024, the Pennsylvania State System of Higher Education, Kutztown University's Petition for Review is granted and the Arbitration Award issued in this matter is hereby VACATED. The Cross-Petition for Review of the PASSHE Officers Association is DISMISSED as MOOT.

                              _____

                              **BONNIE BRIGANCE LEADBETTER,**
                              President Judge Emerita

Pennsylvania State System of Higher  :  **CASES CONSOLIDATED**
Education, Kutztown University,      :
                  Petitioner  :  No. 961 C.D. 2022
                              :
          v.                :
                              :
Pennsylvania State System of Higher  :
Education Officers Association,      :
                  Respondent :

PASSHE Officers Association,      :
                  Petitioner  :  No. 1178 C.D. 2022
                              :  Argued: November 6, 2023
          v.                :
                              :
Pennsylvania State System of Higher  :
Education, Kutztown University,      :
                  Respondent :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

DISSENTING OPINION
BY JUDGE WALLACE                         FILED: May 1, 2024

      I agree in principle that the absence of a social media policy does not wholly excuse Alan Swartz's (Grievant) public Facebook posts. Although many of Grievant's posts are essentially political in nature, others cross the line into displays

of racial or religious hostility. There are several posts targeting Muslims, for example, including one that criticizes the Democratic Party for choosing "Muslims over Americans."[1] Reproduced Record (R.R.) at 742a. Whether made in public or posted online, these types of statements are unbecoming of a police officer. As a matter of common sense, Grievant should have known that such statements could expose him to discipline, and the arbitrator's decision to reinstate Grievant without any sanction at all was contrary to public policy.

I am troubled, however, by how quickly the Majority appears to replace the arbitrator's judgment with its own. The arbitrator's decision reflects a valid due process concern that the Pennsylvania State System of Higher Education, Kutztown University, did not provide its police officers with clear guidance on the use of social media. *See San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135-36 (3d Cir. 1992) (discussing the due process "void of vagueness" doctrine in the context of public employment).

The Majority also pays little heed to Grievant's First Amendment rights, U.S. Const. amend I. The Majority mentions these rights briefly in a footnote, explains they are "not absolute," and moves on. *Pa. State Sys. of Higher Educ., Kutztown Univ. v. Pa. State Sys. of Higher Educ. Officers Ass'n* (Pa. Cmwlth., Nos. 961 C.D. 2022, 1178 C.D. 2022, filed May 1, 2024), slip op. at 14 n.8 (quoting *Commonwealth v. Knox*, 190 A.3d 1146, 1154 (Pa. 2018)). The Majority fails to address the extensive body of case law providing that public employees have the right to speak on matters of public concern. *See, e.g., Fenico v. City of Phila.*, 70 F.4th 151, 162 (3d Cir. 2023).

---

[1] The concern with this post, of course, is not the criticism of a political party but the implication that Muslims cannot be Americans.

In this regard, several jurists have recognized that the proper disposition when an arbitration award violates public policy is not to merely vacate the award but to remand to the arbitrator. Justice Seamus McCaffery, joined by then-Justice, later Chief Justice, Baer, authored a concurrence in *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 52 A.3d 1117 (Pa. 2012), making this point:

> I agree with the majority opinion to the extent that the arbitration award, summarized above, exhibited such scant consideration for the important public policy goal of preventing sexual harassment in the workplace that it must be revisited. By reinstating [the harasser] with back pay, thus imposing no penalty whatsoever on the employee, the arbitrator here failed to consider the victim of the sexual harassment as well as other potentially negative consequences of the award vis-à-vis the public policy that endeavors to discourage and prevent sexual harassment in the workplace. The award could easily be construed by others as giving free cover for harassing behavior until such time as the harasser is provided a warning.

> I believe that under our precedents, as well as those of the United States Supreme Court, the above minimal analysis represents **all** that is needed for a reviewing court to conduct its review of an arbitration award that purportedly violates a public policy. If a reviewing court concludes under established precedents that the arbitration award violates, as it does here, a recognized public policy of this Commonwealth, then no further discussion of the record is warranted. The remedy would be to remand to the arbitrator to reconsider the award in light of the articulated violation. Anything more intrudes upon the **other** public policy against judicial interference in arbitration awards made pursuant to [the Public Employe Relations Act[2]].

*Id.* at 1135 (emphasis in original; footnote omitted).[3]

---

[2] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

[3] *See also Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 956 A.2d 477, 495 (Pa. Cmwlth. 2008) (*en banc*), *aff'd*, 52 A.3d 1117 (Pa. 2012) (Pellegrini, J., dissenting) ("Even if the
**(Footnote continued on next page…)**

Here, the Majority vacates the arbitration award without further comment, effectively terminating Grievant's employment and imposing its own view that no sanction short of termination would be permissible as a matter of law. Mindful of the arbitrator's role as the fact-finder and the countervailing public policy requiring that we avoid interfering with arbitration awards, I would instead vacate and remand for the arbitrator to reconsider his award and impose a sanction commensurate with Grievant's actions. The arbitrator personally observed Grievant's testimony, and he is in the best position to weigh the evidence, including any mitigating evidence,[4] and impose an appropriate form of discipline. The arbitrator might reasonably conclude, given his due process concerns, Grievant's First Amendment rights, and the record as a whole, that a conditional reinstatement, suspension, or other sanction less severe than termination vindicates the public policy against discrimination and protects the community that Grievant serves.

For these reasons, I respectfully dissent.

_____
STACY WALLACE, Judge

---

majority application of the federal public policy exception was correct . . . the remedy is not to reinstate the employer's discipline but to remand to the arbitrator to fashion an award—a remedy that would not violate or advance public policy.").

[4] *See, e.g.*, R.R. at 752a (Grievant's Facebook post expressing support for diversity); R.R. at 429a-30a (Grievant discussing his lack of prior disciplinary history).